# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AMY BRYANT, M.D., et al.,    )
                              )
              Plaintiffs,    )
                              )
              v.            )      1:16cv1368
                              )
JIM WOODALL, et al.,       )
                              )
              Defendants.    )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

On behalf of themselves and their patients seeking abortions, Amy Bryant, M.D., Beverly Gray, M.D., Elizabeth Deans, M.D., and Planned Parenthood South Atlantic (collectively, the "Plaintiffs") filed a "Complaint for Injunctive and Declaratory Relief" (Docket Entry 1) (the "Complaint"), seeking "to challenge the constitutionality of state statutes," specifically, North Carolina General Statute Sections 14-44, 14-45, and 14-45.1 "(collectively the '20-week ban')[, that] ban abortion after the twentieth week of pregnancy" (id., ¶ 1). North Carolina imposed the challenged 20-week ban in May 1973, see, e.g., 1973 N.C. Sess. Laws 1057-58, and Plaintiffs concede that, in its entire forty-five-year existence, "no physician has been prosecuted under [it]" (Docket Entry 66 at 6).[1] Nevertheless, Plaintiffs seek both a declaratory judgment holding North Carolina's 20-week ban unconstitutional and a

---

1 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

permanent injunction preventing its enforcement against them. (See, e.g., Docket Entry 1, ¶¶ 55, 56.) Because Plaintiffs lack standing to pursue this lawsuit, the Court should deny "Plaintiffs' Second Motion for Summary Judgment" (Docket Entry 44) (the "Summary Judgment Motion") and should dismiss this lawsuit for lack of subject-matter jurisdiction. In addition, for the reasons discussed below, the Court will deny "The Parties' Joint Motion to Strike" (Docket Entry 69) (the "Strike Motion").

### BACKGROUND

On November 30, 2016, Plaintiffs filed the Complaint, alleging that:

"North Carolina imposes a general criminal ban on abortion" (Docket Entry 1, ¶ 16) after the twentieth week of pregnancy, subject to a maternal health exemption (see id., ¶¶ 17-19). North Carolina amended the maternal health exemption, found in North Carolina General Statute Section 14-45.1(b), "effect[ive] on January 1, 2016." (Id., ¶ 20.) The amended maternal health exemption authorizes "abortion after the twentieth week of a woman's pregnancy if there is a medical emergency." (Id., ¶ 17.) "Prior to that amendment, the statute provided a health condition exception that allowed a physician to perform an abortion after twenty weeks 'if there is substantial risk that the continuance of the pregnancy would threaten the life or gravely impair the health

of the woman.'"  (Id., ¶ 20 (quoting N.C. Gen. Stat. "§ 14-45.1(b)
(amended 2015)").)  As such,

> [t]h[at] preexisting health exception, like the
> current emergency exception, banned some previability
> abortions.  The 2016 amendment narrowed the scope of the
> exception even further so that it now applies only in
> medical emergencies.  Under the current law, Plaintiffs
> cannot perform certain previability abortions after the
> twentieth week of pregnancy that were authorized under
> the preexisting health exception. However, both prior to
> and after the amendment, the ban prohibited some
> previability abortions.

(Id., ¶ 21.)  "The 20-week ban presents physicians with an
untenable choice:  face criminal prosecution for providing medical
care in accordance with their best medical judgment, or refuse to
provide the critical care their patients seek."  (Id., ¶ 51.)
Thus, on the theory that "the 20-week ban is unconstitutional as
applied to all women seeking previability abortion after the
twentieth week of pregnancy" (id., ¶ 2), "Plaintiffs . . . seek a
declaration that the 20-week ban is unconstitutional and permanent
injunctive relief prohibiting its enforcement as to previability
abortions" (id., ¶ 3).[2]

Two weeks after filing the Complaint, Plaintiffs moved for
summary judgment.  (See Docket Entry 13.)  In response, Jim
Woodall, Roger Echols, Eleanor E. Greene, M.D., and Rick Brajer
(collectively, the "Defendants") requested leave to conduct

---

2  Accordingly, rather than challenging the contours of the
maternal health exemption, Plaintiffs challenge North Carolina's
general prohibition on abortions after 20 weeks.

"limited, expedited discovery" on issues pertinent to Defendants'
opposition to the summary judgment motion, including whether
"[P]laintiffs have standing." (Docket Entry 21 at 9, 10.) The
Court (per the undersigned) granted Defendants' request. (See
Docket Entry 31 at 20.)[3] Following that limited discovery,
Plaintiffs again moved for summary judgment (see Docket Entry 44),
which Defendants oppose, in part on grounds that Plaintiffs failed
to establish their standing to pursue this lawsuit (see, e.g.,
Docket Entry 52 at 7-9).[4] Plaintiffs dispute that assertion.
(See Docket Entry 58 at 2-5.)

In light of its "oblig[ation] to inquire *sua sponte* whenever
a doubt arises as to the existence of federal jurisdiction," Mt.
Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278
(1977), the Court thereafter ordered supplemental briefing
regarding Plaintiffs' standing. (See Docket Entry 65 (the "Order")
at 6.) In particular, the Order explained that "a plaintiff
'contesting the constitutionality of a criminal statute' must
establish, inter alia, that 'there exists a credible threat of

---

3 Plaintiffs objected to that ruling. (See Docket Entry 34.)
The Court (per then-Chief United States District Judge William L.
Osteen, Jr.) overruled Plaintiffs' objections (see Docket Entry 36)
and, in light of the approved discovery, denied Plaintiffs' then-
pending summary judgment motion as not ripe and moot (see Docket
Entry 43).

4 In particular, Defendants maintain that Plaintiffs lack
standing because they cannot "establish that, because of the
statute, they turned away patients with non-viable, 20-24 week
pregnancies." (Id. at 8.)

prosecution thereunder.'" (Id. at 4 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).)[5] The Order further noted that North Carolina's apparently undeviating history of not "prosecut[ing] any doctor for violating th[e] 20-week ban . . . raises questions regarding the existence of 'a credible threat of prosecution.'" (Id. at 5.) Because the parties' filings did not "address th[at] aspect of the standing analysis" (id. at 6), the Court directed "Plaintiffs [to] file a memorandum of no more than ten pages, exclusive of exhibits, regarding their Article III standing to pursue this lawsuit" (id.). The Court further directed Defendants to respond to Plaintiffs' memorandum and permitted Plaintiffs to reply to Defendants' response. (Id.)

In response to the Order, Plaintiffs filed a "Supplemental Memorandum of Law in Support of Plaintiffs' Second Motion for Summary Judgment" (Docket Entry 66) (the "Standing Brief"). They declined, however, to file any exhibits in support thereof. (See Docket Entries dated May 3, 2018, to present.) Defendants similarly filed a response devoid of exhibits (see Docket Entry 67), and Plaintiffs replied thereto (see Docket Entry 68). Thereafter, the parties jointly moved to strike certain exhibits to Defendants' summary judgment opposition — namely, Plaintiffs'

_____

    5  The Order also cautioned that Plaintiffs bore the burden of establishing standing (see id. at 4), with the requisite "'manner and degree of evidence required at the successive stages of the litigation'" (id. at 4 n.4 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992))).

5

discovery responses — and replace them with redacted versions. (See Docket Entry 69 at 1; see also Docket Entries 69-1 to 69-4.) In support of this request, the parties maintained that the proposed replacement exhibits "(1) redact confidential information not relevant to the arguments before this Court, and (2) contain all information necessary for this Court to make a decision on the merits." (Docket Entry 69 at 1.)

## DISCUSSION

### I. Legal Framework

Article III of the Constitution empowers federal courts to decide only "'Cases'" and "'Controversies.'" Ansley v. Warren, 861 F.3d 512, 517 (4th Cir. 2017). "An essential element of this bedrock principle is that any party who invokes the court's authority must establish standing." Id. Generally speaking, to establish "standing, a plaintiff must prove that he has suffered a 'concrete and particularized' injury that is 'fairly traceable to the challenged conduct of the defendant' and is likely to be redressed by a favorable judicial decision." Id. As such, "a party's 'keen interest in the issue' is insufficient by itself to meet Article III's [standing] requirements." Id. "Article III's case-or-controversy limitation ensures that federal courts respect 'the proper — and properly limited — role of the courts in a democratic society.'" Id. at 523. In addition, "[w]here state criminal statutes are challenged, the [case-or-controversy]

requirement protects federalism by allowing the states to control the application of their own criminal laws." Doe v. Duling, 782 F.2d 1202, 1205 (4th Cir. 1986).

The limitations imposed by Article III on the federal judiciary demand scrupulous adherence, for, as the United States Supreme Court recently explained:

> Few exercises of the judicial power are more likely to undermine public confidence in the neutrality and integrity of the Judiciary than one which casts the Court in the role of a Council of Revision, conferring on itself the power to invalidate laws at the behest of anyone who disagrees with them. In an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so. Making the Article III standing inquiry all the more necessary are the significant implications of constitutional litigation, which can result in rules of wide applicability that are beyond Congress' power to change.

Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 145-46 (2011). Thus, there exists an "enduring principle that judges must consider jurisdiction as the first order of business," as "[n]othing can justify adjudication of a suit in which the plaintiff lacks standing or there is some other obstacle to justiciability." Sherman v. Community Consol. Sch. Dist. 21 of Wheeling Twp., 980 F.2d 437, 440 (7th Cir. 1992).

"In its constitutional dimension, the standing inquiry asks whether the party before the court has such a personal stake in the outcome of the controversy as to warrant *his* invocation of

federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 119-20 (1979) (internal quotation marks omitted; emphasis in original). Accordingly, "the irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (emphasis added). Specifically, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, __ U.S. __, __, 136 S. Ct. 1540, 1547 (2016); see also Gladstone, 441 U.S. at 120 ("To demonstrate the 'personal stake' in the litigation necessary to satisfy the Constitution, the party must suffer 'a distinct and palpable injury' that bears a '"fairly traceable" causal connection' to the challenged action." (citation omitted)). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561. Furthermore, because "they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Id.

To establish an "injury in fact, the first and foremost of standing's three elements," Spokeo, __ U.S. at __, 136 S. Ct. at 1547 (internal quotation marks and brackets omitted), a "plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical,'" City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983); see also Babbitt, 442 U.S. at 298 ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." (emphasis added)). Accordingly, as relevant to the instant matter, a plaintiff "contesting the constitutionality of a criminal statute" must establish, inter alia, that "there exists a credible threat of prosecution thereunder." Babbitt, 442 U.S. at 298 (emphasis added).

In this regard, the United States Court of Appeals for the Fourth Circuit has explained:

> The Supreme Court has made it abundantly clear that one challenging the validity of a criminal statute must show a threat of prosecution under the statute to present a case or controversy. The threat must be "credible" and "alive at each stage of the litigation." The [Supreme] Court has noted, however, that "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." A litigant must show more than the fact that state officials stand ready to perform their general duty to enforce laws. Even past threats of prosecution may not be sufficient to establish a controversy

> susceptible of resolution in federal court.  In short,
> one must show a threat of prosecution that is both real
> and immediate before a federal court may examine the
> validity of a criminal statute.

Duling, 782 F.2d at 1205-06 (citations omitted).  Finally,

plaintiffs who "seek declaratory and injunctive relief . . . must

establish an ongoing or future injury in fact."  Kenny v. Wilson,

885 F.3d 280, 287 (4th Cir. 2018).

## II. Standing Analysis

In their Standing Brief, Plaintiffs maintain that, "although

no physician has been prosecuted under [the challenged] 20-week

ban, that in no way undermines Plaintiffs' standing."  (Docket

Entry 66 at 6.)  Plaintiffs offer three arguments in support of

this proposition.  (See id. at 6-15.)  As discussed below, those

arguments lack merit.

First, Plaintiffs maintain that the absence of prosecutions

demonstrates physicians' compliance with the law, creating a

"constitutionally-suspect chilling effect" (id. at 11).  (See id.

at 6 (asserting that the absence of prosecutions "demonstrates that

physicians have complied with the law, chilling the provision of

constitutionally-protected care for women in North Carolina").)  As

a preliminary matter, Plaintiffs offer no evidence in support of

this sweeping assertion.  (See generally Docket Entry 66.)  At this

stage in the proceedings, however, Plaintiffs may not rely on "such

mere allegations, but must set forth by affidavit or other evidence

specific facts" in support of their standing assertions.  Lujan,

504 U.S. at 561 (internal quotation marks omitted).  Moreover, the evidence before the Court raises serious doubts about the veracity of such contention.    In particular, Bryant's interrogatory responses reflect that she performed an estimated ten post-20-week abortions between the years 2014 and 2016 "because of diagnoses of fetal anomalies and/or maternal health indications" (Docket Entry 53-1 at 8).   (See id. at 6-8.)   Notably, though, "diagnoses of fetal anomalies" (id. at 8) do not appear to constitute valid grounds for such abortions under North Carolina law.  See N.C. Gen. Stat. § 14-45.1(b).

Furthermore, Plaintiffs' "chilling effect" theory fails to establish standing in this case.[6]   The notion that a "chilling

_____

6  In this regard, it bears noting that the evidence does not clearly establish that the 20-week ban has prevented Plaintiffs from conducting abortions.   Plaintiffs aver that "[b]ut for the 20-week ban, [they] would provide abortion[s] after 20 weeks" (Docket Entry 13-1, ¶ 14) and that the 20-week ban "forc[es them] to deny and delay care for [their] patients" (id., ¶ 19).  (Accord Docket Entry 13-3, ¶¶ 7, 10; see also Docket Entry 13-2, ¶¶ 6, 7.) They further indicate that they provide (and seek to provide) first- and second-trimester abortions (see Docket Entry 13-1, ¶ 8; Docket Entry 13-3, ¶ 6), until a maximum of 24 weeks (see Docket Entry 34 at 7; Docket Entry 53-1 at 6).  Yet, although they note their "aware[ness]" (Docket Entry 53-2 at 4) of requests for abortions from women with post-20-week pregnancies, they do not identify any woman whom they (or their practices) refused to provide an abortion because she fell in the 20-24-week pregnancy range but did not qualify for the maternal health exemption rather than, say, because her pregnancy had progressed beyond the 24-week gestational mark at which they cease — or, in the absence of the 20-week ban, allegedly would cease — providing abortions.   For instance, Bryant states only that she "is aware that her practice . . . receives multiple requests each year for abortion procedures at various gestational ages" and "it is [her] understanding that the administrative staff would then inform the individual making

effect" can support a lawsuit derives from the First Amendment realm. See, e.g., Legend Night Club v. Miller, 637 F.3d 291, 300 (4th Cir. 2011) ("The Constitution provides protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." (internal quotation marks omitted)). "In the context of threats to the right of free expression, courts justifiably often lessen standing requirements." American Booksellers Ass'n, Inc. v. Virginia, 802 F.2d 691, 694 n.4 (4th Cir. 1986), vacated sub nom. Virginia v. American Booksellers Ass'n, Inc., 488 U.S. 905 (1988), certified question answered sub nom. Commonwealth v. American Booksellers Ass'n, Inc., 372 S.E.2d 618 (Va. 1988); see also Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 956 (1984) ("Within the context of the First Amendment, the [Supreme] Court has enunciated other concerns that justify a lessening of prudential limitations on standing.").[7]

---

the request if the [practice] cannot provide the requested abortion." (Docket Entry 53-1 at 4-5; see also Docket Entry 13-1.) As a further example, Planned Parenthood states that it "turned away" at least 31 women seeking abortions with post-20-week pregnancies in 2016 (Docket Entry 53-4 at 5), but does not indicate whether (1) any of those women fell in the 20-24-week range in which Planned Parenthood theoretically would provide abortions in the absence of the 20-week ban or (2) whether any of those women qualified for abortions under the maternal health exemption. (See id. at 5-7; see also Docket Entry 13-2.) Finally, Plaintiffs do not identify any patient whose abortion they had to delay to ensure that she qualified for the maternal health exemption. (See Docket Entries 13-1 to 13-3; Docket Entries 53-1 to 53-4.)

    7 Courts adopt this approach because of the risk that those whose protected first-amendment activities a statute burdens will refrain from the protected speech or expressive activity "rather

Yet, "[e]ven in the area of First Amendment disputes, the Supreme Court has generally required a credible threat of prosecution before a federal court may review a state statute." Duling, 782 F.2d at 1206; see also Joseph H. Munson, 467 U.S. at 957-58 (explaining that even litigants bringing first-amendment overbreadth challenges must meet "the Art[icle] III case-or-controversy requirement" by "satisf[ying] the requirement of 'injury-in-fact'"); Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011) ("Although the assertion of a facial challenge to an ordinance based on the First Amendment may warrant some relaxation of the prudential rule that a claimant may assert her own rights only, the claimant must nevertheless satisfy the injury-in-fact requirement grounded in Article III.").[8]

---

than risk punishment for his conduct in challenging the statute." Joseph H. Munson, 467 U.S. at 956. As the Supreme Court has explained:

> [W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

Id. at 956-57 (internal quotation marks omitted).

8  In other words,

> [o]verbreadth is an exception to the prudential standing doctrine requiring plaintiffs to show that their own

Nonetheless, Plaintiffs maintain that the mere existence of the 20-week ban creates a coercive, chilling impact that provides them with standing. (See, e.g., Docket Entry 66 at 11.) In making this argument, Plaintiffs rely on two decisions: MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007), and Richmond Medical Center for Women v. Gilmore, 55 F. Supp. 2d 441 (E.D. Va. 1999), aff'd, 224 F.3d 337 (4th Cir. 2000). (See Docket Entry 66 at 11-12.) Neither decision supports Plaintiffs' position.

To begin with, MedImmune involved a patent and contract dispute and presented the question of

> whether Article III's limitation of federal courts' jurisdiction to "Cases" and "Controversies," reflected in the "actual controversy" requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), requires a patent licensee to terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed.

MedImmune, 549 U.S. at 120-21. Those circumstances bear little connection to the standing questions raised by the instant dispute. More importantly, however, MedImmune itself reflects the necessity of "[a] genuine threat of enforcement" before a plaintiff can mount a pre-enforcement challenge to governmental conduct. See id. at

---

> First Amendment rights (as opposed to the rights of third parties) have been violated, but it does not exempt plaintiffs — even plaintiffs bringing facial challenges on overbreadth grounds — from the bedrock Article III standing requirements of injury-in-fact, causation, and redressability.

Winsness v. Yocom, 433 F.3d 727, 734 (10th Cir. 2006).

129. Plaintiffs merely chose to omit that pivotal portion of the Supreme Court's decision in the quotation they presented to this Court. (See Docket Entry 66 at 11.) Moreover, even the portion of the quotation Plaintiffs present reflects the necessity of "'threatened action by [the] government,'" such as "'a law threatened to be enforced.'" (Id. at 11.) The other decision cited by Plaintiffs likewise recognizes the necessity of "the existence of a credible threat that the challenged law will be enforced against the plaintiffs." Gilmore, 55 F. Supp. 2d at 461.

Put simply, "[t]he mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006); see Younger v. Harris, 401 U.S. 37, 41-42 (1971) (rejecting the plaintiffs' argument that they possessed standing because "they feel inhibited" by, inter alia, "the presence of [an] Act on the books" (internal quotation marks omitted)); see also Arizona Christian, 563 U.S. at 135 (explaining that "[t]he party who invokes the power of the federal courts must be able to show not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement" (brackets and internal

quotation marks omitted)).  After all, if the mere existence of a statute sufficed to establish standing,

> the case or controversy requirement would be set at naught.  Every criminal law, by its very existence, may have some chilling effect on personal behavior.  That was the reason for its passage.  A subjective chill, however, is 'not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm,' save in rare cases involving core First Amendment rights.

Duling, 782 F.2d at 1206 (citation omitted) (quoting Laird v. Tatum, 408 U.S. 1, 13-14 (1972)) (rejecting the plaintiffs' argument that they possessed standing because "they are fearful of [engaging in statutorily prohibited conduct] since they have learned of the statutes in question").

Plaintiffs next assert that, "where, as here, the State has not disavowed an intent to prosecute violations, lack of prosecution is no bar to standing."  (Docket Entry 66 at 11 (citing Babbitt, 442 U.S. at 301-02); see also id. at 15 (arguing that "the State defends the [20-week] ban").)  As an initial matter, the decision Plaintiffs cite in support of this argument involved a first-amendment challenge to provisions of a recently enacted law (the "Act") that, by their plain language, applied to the union-plaintiff's expressive activities (i.e., consumer publicity campaigns).  Babbitt, 442 U.S. at 292, 302.  Since its passage, the Act had been enforced against the union and its members and supporters through seven lawsuits and at least one set of charges.  See United Farm Workers Nat'l Union v. Babbitt, 449 F. Supp. 449,

452 (D. Ariz. 1978), _rev'd_, 442 U.S. 289 (1979), _and_ _vacated sub nom._ _Babbitt_, 442 U.S. 936; _see also_ _Babbitt_, 442 U.S. at 293 & n.2.   Before the Supreme Court, however, the governmental defendants argued that a criminal penalty provision applicable to any violations of the Act "has not yet been applied and may never be applied to commissions of unfair labor practices, including forbidden consumer publicity."   _Babbitt_, 442 U.S. at 302. Rejecting this argument, the Supreme Court found that the plaintiffs possessed standing, as the plain language of the Act applied to the plaintiffs' _expressive_ activities and, "[m]oreover, the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices," _id._  _See_ _id._ at 301-02.  _Babbitt_ thus does not support the proposition that a State's defense of the constitutionality of its laws, by itself, creates standing for the parties suing it.

Nor does this proposition accurately reflect the law.  For instance, in both _Duling_ and _Poe v. Ullman_, 367 U.S. 497 (1961), state officials defended the constitutionality of the challenged state laws and yet the plaintiffs lacked standing to pursue their challenges.  _See_ _Poe_, 367 U.S. at 507-08 (finding the plaintiffs lacked standing, explaining that "[i]t is clear that the mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's

prosecuting officials if real threat of enforcement is wanting,"
id. at 507); Duling, 782 F.2d at 1202, 1204 (holding that the
plaintiffs lacked standing in lawsuit defended by state officials);
see also, e.g., Doe v. Duling, 603 F. Supp. 960, 967-68 (E.D. Va.
1985) (analyzing government defendants' arguments in support of the
challenged statute), vacated, 782 F.2d 1202 (4th Cir. 1986).

In Plaintiffs' view, however, Poe "is distinguishable" from
the instant matter:

> Although in *Poe v. Ullman*, the Court held plaintiffs
> lacked standing to challenge a statute restricting
> medical advice on and use of contraceptives because there
> were no recorded prosecutions, that case is
> distinguishable because "contraceptives were commonly and
> notoriously sold in Connecticut drug stores." The court
> held that "certainly such ubiquitous, open, public sales
> would more quickly invite the attention of enforcement
> officials than the conduct alleged in the suit — the
> giving of private medical advice by a doctor to his
> individual patients, and their private use of the devices
> prescribed." The court concluded that "the undeviating
> policy of nullification by Connecticut of its
> anti-contraceptive laws throughout all the long years
> that they have been on the statute books bespeaks more
> than prosecutorial paralysis." Here, however, there are
> no analogous "notorious" but unprosecuted violations of
> the ban.

(Docket Entry 66 at 10 (citations, brackets, and footnote
omitted).)

In making this argument, Plaintiffs misread Poe. In that
case, the Supreme Court held that the absence of relevant
prosecutions, not the existence of contraceptive sales, established
the absence of a credible threat of prosecution. See, e.g., Poe,
367 U.S. at 501-02 ("The Connecticut law prohibiting the use of

contraceptives has been on the State's books since 1879. During the more than three-quarters of a century since its enactment, a prosecution for its violation seems never to have been initiated, save in [one test case in 1940]. . . . Neither counsel nor our own researches have discovered any other attempt to enforce the prohibition of distribution or use of contraceptive devices by criminal process." (citation omitted)), 508 ("The fact that Connecticut has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication. . . . To find it necessary to pass on these statutes now, in order to protect appellants from the hazards of prosecution, would be to close our eyes to reality."); <u>see also, e.g.,</u> <u>id.</u> at 509 (Brennan, J., concurring) ("I agree that this appeal must be dismissed for failure to present a real and substantial controversy which unequivocally calls for adjudication of the rights claimed in advance of any attempt by the State to curtail them by criminal prosecution.").[9]

---

9  As Justice Brennan explained:

The true controversy in this case is over the opening of birth-control clinics on a large scale; it is that which the State has prevented in the past, not the use of contraceptives by isolated and individual married couples. It will be time enough to decide the constitutional questions urged upon us when, if ever, that real controversy flares up again. Until it does, or until the State makes a definite and concrete threat to enforce these laws against individual married couples —

Moreover, Plaintiffs provide no support for the proposition that "there are no analogous 'notorious' but unprosecuted violations of the [20-week] ban." (Docket Entry 66 at 10.)[10] Further, the record raises some doubt as to this contention. To begin with, Plaintiffs objected to Defendants' request to conduct discovery and their interrogatories on the grounds that North Carolina law obliges doctors to report all abortions they perform to state officials, "includ[ing] information on abortions provided by Plaintiffs from 2014-2016" (Docket Entry 34 at 23). (See id. at 7-8; see also, e.g., Docket Entry 53-4 at 5 ("Plaintiff is required to, and does, report to the North Carolina Department of Health and Human Services [(the "DHHS")] information concerning the number of abortion procedures performed by gestational age on the Confidential Induced Abortion Case Report form (DHHS 1891).");

Docket Entry 53-2 at 10 (objecting to interrogatory on the grounds that "Plaintiff's employer is required to, and does, report to [DHHS] information about its abortion procedures . . . [on] DHHS 1891" and "stat[ing] that she can recall performing one abortion

---

> a threat which it has never made in the past except under the provocation of litigation — this Court may not be compelled to exercise its most delicate power of constitutional adjudication.

Id.

10  "Notorious" means "well known; commonly or generally known;" and "well or widely known." Notorious, Oxford English Dictionary, http://www.oed.com/view/Entry/128640 (last visited Aug. 24, 2018).

procedure after the gestational limit set forth in N.C. Gen. Stat. § 14-45.1" in the relevant period).) The record further reflects that, in the years 2014 to 2016, two Plaintiffs collectively performed roughly eleven abortions after the 20-week gestational limit. (See Docket Entry 53-1 at 6; Docket Entry 53-2 at 6.) Finally, the record reflects that at least some of these abortions occurred because of "diagnoses of fetal anomalies" (Docket Entry 53-1 at 8), action that does not appear permissible under the 20-week ban, see N.C. Gen. Stat. § 14-45.1.

Accordingly, the record reveals that, pursuant to legal reporting obligations, North Carolina received information on abortions performed after 20 weeks — some of which appear to violate the 20-week ban — without initiating enforcement measures. Further, to the extent that such reporting requirements fail to disclose the potentially violative nature of those abortions, Bryant's interrogatory responses brought this matter to light. (See Docket Entry 53-1 at 6-8 (indicating that Bryant performed approximately ten post-20-week abortions between 2014 and 2016 "because of diagnoses of fetal anomalies and/or maternal health indications").) Plaintiffs disclosed this information on July 17, 2017. (Id. at 12.) Notably, though, in the year since they received this information, Defendants have not — as far as the record reflects — initiated any enforcement efforts against Bryant.

Under the circumstances, both Plaintiffs' attempt to distinguish <u>Poe</u> and their arguments regarding Defendants' defense of this litigation lack merit.

Finally, Plaintiffs maintain that they possess standing to challenge the 20-week ban, despite the total absence of prosecutions against physicians during its 45-year-history, because "every federal appellate court faced with a previability abortion ban has ruled that it violates the Fourteenth Amendment, and none have questioned physicians' standing" (Docket Entry 66 at 14). (<u>See also</u> <u>id.</u> at 9, 10, 12-14; Docket Entry 45 at 14, 15 & nn.6, 7.) Significantly, though, every decision Plaintiffs cite in support of this proposition involves either a recently enacted law or a recent enforcement measure. (<u>See</u> Docket Entry 66 at 9, 10 (citing, in turn, <u>Diamond v. Charles</u>, 476 U.S. 54 (1986); <u>Planned Parenthood of Wis. v. Doyle</u>, 162 F.3d 463 (7th Cir. 1998); <u>Doe v. Bolton</u>, 410 U.S. 179 (1973); <u>City of Akron v. Akron Ctr. for Reprod. Health, Inc.</u>, 462 U.S. 416 (1983), <u>overruled by</u> <u>Planned Parenthood of Se. Pa. v. Casey</u>, 505 U.S. 833 (1992); <u>Colautti v. Franklin</u>, 439 U.S. 379 (1979); <u>Planned Parenthood of Cent. Mo. v. Danforth</u>, 428 U.S. 52 (1976)), 12-14 (citing, in turn, <u>Gilmore</u>, 55 F. Supp. 2d 441; <u>Greenville Women's Clinic v. Bryant</u>, 222 F.3d 157 (4th Cir. 2000); <u>Greenville Women's Clinic v. Bryant</u>, 66 F. Supp. 2d 691 (D.S.C. 1999), <u>rev'd</u>, 222 F.3d 157 (4th Cir. 2000); <u>Stuart v. Camnitz</u>, 774 F.3d 238 (4th Cir. 2014); <u>Stuart v. Loomis</u>, 992

22

F. Supp. 2d 585 (M.D.N.C. 2014); <u>North Carolina Right to Life, Inc.</u>
<u>v. Bartlett</u>, 168 F.3d 705 (4th Cir. 1999); <u>Isaacson v. Horne</u>, 716
F.3d 1213 (9th Cir. 2013); <u>Planned Parenthood of Idaho, Inc. v.</u>
<u>Wasden</u>, 376 F.3d 908 (9th Cir. 2004); <u>McCormack v. Herzog</u>, 788 F.3d
1017 (9th Cir. 2015); <u>Planned Parenthood of Greater Tex. Surgical</u>
<u>Health Servs. v. Abbott</u>, 748 F.3d 583 (5th Cir. 2014); <u>Doyle</u>, 162
F.3d 463; <u>Planned Parenthood Ass'n of the Atlanta Area, Inc. v.</u>
<u>Miller</u>, 934 F.2d 1462 (11th Cir. 1991); <u>Planned Parenthood Sw. Ohio</u>
<u>Region v. DeWine</u>, 64 F. Supp. 3d 1060 (S.D. Ohio 2014); <u>Guam Soc'y</u>
<u>of Obstetricians & Gynecologists v. Ada</u>, 962 F.2d 1366 (9th Cir.
1992); <u>Jackson Women's Health Org. v. Currier</u>, No. 3:18-cv-171,
2018 WL 1567867 (S.D. Miss. Mar. 20, 2018)); <u>see also</u> Docket Entry
45 at 14, 15 & nn.6, 7 (citing, in turn, <u>MKB Mgmt. Corp. v.</u>
<u>Stenehjem</u>, 795 F.3d 768 (8th Cir. 2015); <u>Edwards v. Beck</u>, 786 F.3d
1113 (8th Cir. 2015); <u>Isaacson</u>, 716 F.3d 1213; <u>Carhart v. Stenberg</u>,
192 F.3d 1142 (8th Cir. 1999), <u>aff'd</u>, 530 U.S. 914 (2000); <u>Women's</u>
<u>Med. Prof'l Corp. v. Voinovich</u>, 130 F.3d 187 (6th Cir. 1997); <u>Jane</u>
<u>L. v. Bangerter</u>, 102 F.3d 1112 (10th Cir. 1996); <u>Sojourner T. v.</u>
<u>Edwards</u>, 974 F.2d 27 (5th Cir. 1992); <u>Guam Soc'y</u>, 962 F.2d 1366;
<u>DesJarlais v. State, Office of the Lieutenant Governor</u>, 300 P.3d
900 (Alaska 2013); <u>In re Initiative Petition No. 395, State</u>
<u>Question No. 761</u>, 286 P.3d 637 (Okla. 2012); <u>Wyoming Nat'l Abortion</u>
<u>Rights Action League v. Karpan</u>, 881 P.2d 281 (Wyo. 1994); <u>In re</u>

Initiative Petition No. 349, State Question No. 642, 838 P.2d 1 (Okla. 1992)).)[11]

To begin with, many of these decisions involve lawsuits initiated prior to the effective date of the relevant law or regulation. See Akron, 462 U.S. at 425; Colautti, 439 U.S. at 383; MKB Mgmt., 795 F.3d at 770; Camnitz, 774 F.3d at 243; Abbott, 748 F.3d at 587; Isaacson, 716 F.3d at 1217-18; Greenville Women's, 222 F.3d at 160, 162; Women's Med., 130 F.3d at 190-92; Loomis, 992 F. Supp. 2d at 588; Edwards v. Beck, 946 F. Supp. 2d 843, 845 (E.D. Ark. 2013); Gilmore, 55 F. Supp. 2d at 444; see also Planned Parenthood Cincinnati Region v. Taft, 444 F.3d 502, 506-07 (6th Cir. 2006) (detailing initial litigation history of statute

---

11 Notably, although not abortion cases, Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383 (1988), and Babbitt likewise reflect this pattern. See American Booksellers, 484 U.S. at 392 (lawsuit initiated before effective date), certified question answered sub nom. Commonwealth v. American Booksellers Ass'n, Inc., 372 S.E.2d 618 (Va. 1988); Babbitt, 442 U.S. at 292 (indicating law enacted in 1972); United Farm Workers, 449 F. Supp. at 449 (bearing "72" case number), 450 (reflecting intervention granted to certain parties in 1973). The first-amendment decision in Epperson v. State of Arkansas, 393 U.S. 97 (1968), likewise involved a recent official mandate: the use of a new biology textbook containing a chapter on evolution, in contravention of a state law prohibiting such instruction on pain of dismissal and criminal punishment. See id. at 98-99. As the Supreme Court noted, the plaintiff (a biology teacher) "faced at least a literal dilemma because she was supposed to use the new textbook for classroom instruction and presumably to teach the statutorily condemned chapter; but to do so would be a criminal offense and subject her to dismissal." Id. at 100. Accordingly, "[s]he instituted the present action [in state court], seeking a declaration that the Arkansas statute is void and enjoining the State and the defendant officials of the Little Rock school system from dismissing her for violation of the statute's provisions." Id.

challenged in DeWine, see DeWine, 64 F. Supp. 3d at 1062-63); DesJarlais, 300 P.3d at 901 (involving proposed initiative); In re Initiative Petition No. 395, 286 P.3d at 637-38 (same); Wyoming Nat'l Abortion, 881 P.2d at 283-84, 293 (same); In re Initiative Petition No. 349, 838 P.2d at 3 (same).

Further, with two exceptions, the remaining decisions concern legislation "recently enacted," Bolton, 410 U.S. at 181. See Diamond, 476 U.S. at 57 (lawsuit filed same day as law enacted); Danforth, 428 U.S. at 56 (lawsuit initiated three days after law enacted); Wasden, 376 F.3d at 914 (law enacted in 2000, lawsuit initiated in June 2000 challenging "then-new" statute, law amended in 2001, and complaint "revised to reflect the 2001 amendments"); Carhart, 192 F.3d at 1145 ("Shortly after the passage of LB 23, Dr. LeRoy Carhart filed a complaint challenging the constitutionality of the statute."); Doyle, 162 F.3d at 464 (challenging "recently enacted" statute); Jane L. v. Bangerter, 61 F.3d 1493, 1495 (10th Cir. 1995) (law passed January 25, 1991, and lawsuit initiated April 1991), cert. granted, judgment rev'd sub nom. Leavitt v. Jane L., 518 U.S. 137 (1996); Sojourner T., 974 F.2d at 29 ("The Louisiana Abortion Statute was passed on June 18, 1991," and the district court opinion issued August 7, 1991, see Sojourner v. Roemer, 772 F. Supp. 930, 930 (E.D. La. 1991), aff'd sub nom. Sojourner T., 974 F.2d 27); Guam Soc'y, 962 F.2d at 1368 ("The validity of the Act was immediately challenged

. . . ."); <u>Miller</u>, 934 F.2d at 1466-67 (law enacted 1987, lawsuit

filed and law enjoined the same year, while appeal pending, law

amended (in 1988) and again enjoined (in 1988)); <u>Jackson Women's</u>,

2018 WL 1567867, at *1 (lawsuit filed same day as law enacted).

The two other decisions involve recent enforcement measures.

<u>See</u> <u>McCormack</u>, 788 F.3d at 1022-23 (prosecution initiated on May

18, 2011, and dismissed for lack of probable cause on September 7,

2011; lawsuit initiated on September 16, 2011; law preliminarily

enjoined on November 14, 2011; and prosecutor decided not to re-

file charges against the original plaintiff on August 22, 2012);

<u>Bartlett</u>, 168 F.3d at 709-11 (lawsuit initiated after state

officials notified (1) the plaintiffs that their proposed actions

violated certain legal provisions and (2) a similarly situated

organization that it needed to comply with the remaining challenged

legal provision).[12]

---

[12]  The parties devote much attention to <u>Bartlett</u>, but, in so
doing, overlook certain key differences between that case and the
instant matter.  (<u>See</u> Docket Entry 66 at 12 n.3; Docket Entry 67 at
2-3; Docket Entry 68 at 2-3.)  First, <u>Bartlett</u> involved a first-
amendment challenge to certain state laws, a context in which, as
discussed above, concerns for chilling effects upon protected
expressive activities inform the standing analysis.  <u>See also</u>,
<u>e.g.</u>, <u>id.</u>, 168 F.3d at 710.  Second, in <u>Bartlett</u>, the defendants
argued that, contrary to the plain language of the relevant
statutes, the State did not (and had never) applied these statutes
to groups such as the plaintiffs or activities such as they
proposed to do.  <u>See</u> <u>id.</u> at 710-11.  However, state officials had
twice informed one set of plaintiffs that their proposed expressive
activity (distributing a voter guide) violated these laws, <u>see</u> <u>id.</u>
at 709-10, and had informed an entity similarly situated to the
remaining plaintiff that it had to comply with the relevant laws,
<u>see</u> <u>id.</u> at 711.  In light of those state notifications, the

Thus, in all the decisions that Plaintiffs cite, the credible threat of enforcement arose from the recency of the challenged provision's enactment and/or the government's enforcement measures, circumstances which provide standing, see, e.g., Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit.  The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.  We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."), certified question answered sub nom. Commonwealth v. American Booksellers Ass'n, Inc., 372 S.E.2d 618 (Va. 1988); Hoffman v. Hunt, 845 F. Supp. 340, 347

---

plaintiffs refrained from their proposed expressive activities and altered their speech to comply with the relevant laws. See id. at 710-11.  Accordingly, the Fourth Circuit concluded that a credible threat of enforcement existed, chilling the plaintiffs' first-amendment rights and establishing the required case or controversy:

> In sum, this case presents a statute aimed directly at [the] plaintiffs who will have to take significant . . . compliance measures or risk criminal prosecution. In such a circumstance, courts have long recognized that the statute's mere existence risks chilling First Amendment rights.  Indeed, in this case, [one plaintiff] has discontinued distributing its voter guide and [another plaintiff] has stopped soliciting without providing a disclaimer because of a credible threat of prosecution. Consequently, a case or controversy inheres in each provision.

Id. at 711 (citation and internal quotation marks omitted; ellipsis in original).  By contrast, the instant matter involves neither first-amendment rights nor state enforcement measures that would generate the necessary credible threat of enforcement.

(W.D.N.C. 1994) (explaining that, like in <u>Bolton</u>, "the [p]laintiffs are faced with a statute . . . so new that it has yet to be fully enforced" and that "the newness of this statute is also what gives it vigor and potential potency," for "[i]ts youth counsels not that it will go unenforced, but instead that the reach of its proscriptions and the zeal of their enforcement remains unknown").

Here, however, North Carolina enacted the 20-week ban more than forty-five years ago, <u>see</u> 1973 N.C. Sess. Laws 1057-58, and has never enforced it against a physician. (<u>See</u> Docket Entry 65 at 5; Docket Entry 66 at 6.)[13]  Accordingly, the cases upon which

_____

13     Although the parties do not discuss this matter (<u>see</u> Docket Entries 66-68), it appears that North Carolina has only prosecuted a violation of the 20-week ban one time in its forty-five-year history.  In February 1987, the Cumberland County Grand Jury indicted a defendant for murdering a pregnant woman, "'in violation of North Carolina General Statutes Section 14-17,'" as well as for "'unlawfully, willfully and feloniously . . . employ[ing] an instrument, a 410 shotgun, on Donna Faye West Beale, a pregnant woman, by firing the 410 shotgun with intent to destroy the unborn child, in violation of North Carolina General Statutes Section 14-44."  <u>State v. Beale</u>, 324 N.C. 87, 88, 376 S.E.2d 1, 1 (1989).  (The Grand Jury thereafter issued a superseding indictment charging the defendant with two counts of murder, in violation of Section 14-47, and dropping the Section 14-44 charge.  <u>See id.</u>, 376 S.E.2d at 1.)  Given, <u>inter alia</u>, its entirely distinguishable factual setting, this thirty-one-year-old prosecution does not give rise to a credible enforcement threat against physicians under the 20-week ban.  <u>See, e.g.</u>, <u>Duling</u>, 782 F.2d at 1206-07 (finding the plaintiffs lacked standing where ongoing arrests and prosecutions involved factually distinguishable conduct, noting, <u>inter alia</u>, that "not one arrest has been shown to involve the behavior at issue in this case," as such arrests "arose instead from prostitutional or non-private behavior, not at issue here," <u>id.</u> at 1206); <u>see also</u> <u>Poe</u>, 367 U.S. at 501 (plurality opinion) (concluding that the plaintiffs lacked standing notwithstanding a case decided twenty-one years previously, whose circumstances "only prove the abstract character of what is before us").

Plaintiffs rely fail to establish their standing in this litigation.

In sum, Plaintiffs have not shown a credible threat of prosecution under the 20-week ban. As such, Plaintiffs fail to establish Article III standing to pursue this lawsuit. See, e.g., Duling, 782 F.2d at 1206 ("In short, one must show a threat of prosecution that is both real and immediate before a federal court may examine the validity of a criminal statute." (citation omitted)). The Court should therefore dismiss this lawsuit for lack of subject-matter jurisdiction. See Stephens v. County of Albemarle, 524 F.3d 485, 486 (4th Cir. 2008) ("[B]ecause [the plaintiff] lacks standing to pursue her claims, the district court was without subject-matter jurisdiction to consider the merits of her claims.").

### III. Strike Motion

Finally, the parties jointly seek to strike certain exhibits to Defendants' opposition to the Summary Judgment Motion on the grounds that such exhibits "contain information that Plaintiffs marked as confidential pursuant to the parties' Protective Agreement, dated July 14, 2017, and entered into by the consent of the parties." (Docket Entry 69 at 2.)[14]   The parties seek to

_____

14 This Protective Agreement does not appear in the record, and the parties did not seek a Protective Order based on such agreement. (See Docket Entries dated June 1, 2017, to present; see also Docket Entry 60 at 1 ("Said answers and responses contain what Plaintiffs believe is confidential, Privacy Act information

replace these exhibits "with redacted versions, which (1) redact confidential information not relevant to the arguments before this Court, and (2) contain all information necessary for this Court to make a decision on the merits." (Id. at 1.) In particular, "[t]he [p]arties agree that none of the redacted information in the Exhibits is relevant to Defendants' arguments contained in The Defendants' Response to the Plaintiffs' Second Motion for Summary Judgment, ECF No. 52." (Docket Entry 70 at 4.)

As authority for this request, the parties cite only "*Longman v. Food Lion Inc.*, 186 F.R.D. 331, 334–35 (M.D.N.C. 1999) (citing *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 529 F. Supp. 866, 893–94 (E.D.P.A. [sic] 1981) (discussing impropriety of declassification after discovery began where there was no contemporaneous objection to any confidentiality designation))." (Docket Entry 70 at 4.) However, <u>Longman</u> provides inadequate support for the parties' request. In that case, the plaintiffs sought "to generally strike the Confidentiality Order," which had been "entered by the Court" more than four years earlier, and "unseal the entire record on appeal, . . . request[ing] full public disclosure of the discovery material in the nine volumes submitted in connection with the summary judgment motion," which "w[ere] filed under seal, as required by the Confidentiality Order."

_____

protected under the parties' Protective Agreement, dated July 14, 2017, and entered into by the consent of the parties (without Court order).").)

<u>Longman</u>, 186 F.R.D. at 332.[15]  Here, by contrast, no such court order exists and the parties did not file the relevant materials under seal.  (<u>See</u> Docket Entries dated June 1, 2017, to present.) Rather, on representation by counsel two weeks after filing said exhibits that they were "filed publicly in error" and that a "[m]otion to seal [was] forthcoming," the Clerk "temporarily restrict[ed access to the] attachments pending [a] ruling on [such] motion to seal."  (Docket Entry dated Dec. 4, 2017.)[16]

Now, though, the parties have opted "not [to] file[] a motion to seal," on the theory that such "remedy is unnecessary where, as here, the less drastic alternative of providing this Court with redacted copies of the exhibits, which contain all the information relevant to the arguments before the Court, will afford adequate protection."  (Docket Entry 70 at 4 n.1 (citing M.D.N.C. LR 5.4(b)(2)).)  As an initial matter, it seems a dubious proposition that permanently altering the court record by permitting the parties to strike materials filed eight months previously and replace them with revised versions qualifies as "less drastic" than

_____

15  "[C]onclud[ing] that [the p]laintiffs have failed to show good cause for modification of the protective order," the <u>Longman</u> court denied their "Motion to Strike Confidentiality Order . . ., and the Confidentiality Order as entered on December 2, 1994 remain[ed] in effect."  <u>Id.</u> at 335.

16  Defendants submitted five exhibits with their opposition (Docket Entries 53-1 through 53-5), but the parties seek only to strike and replace four of those exhibits (<u>i.e.</u>, Docket Entries 53-1 through 53-4) (<u>see</u> Docket Entry 69 at 1).

sealing the portions of those filings that the parties now seek to redact. Moreover, if the parties do not seek to submit redacted versions of these materials in connection with a motion to seal, it remains unclear under what authority they bring their request.

Even setting aside such concerns, the Strike Motion suffers from a fatal defect: it seeks redaction of information directly relevant to arguments Plaintiffs advanced in their Standing Brief and thus to this Court's standing analysis. (Compare Docket Entries 69-1 to 69-4, with Docket Entries 53-1 to 53-4.) For instance, the parties seek to strike information concerning the number of post-20-week abortions Bryant performed in 2016. (Compare Docket Entry 53-1 at 6, with Docket Entry 69-1 at 6.) By way of further example, they also seek to redact information concerning the reasons (i.e., "diagnoses of fetal anomalies and/or maternal health indications" (Docket Entry 53-1 at 8)) for the post-20-week abortions Bryant performed in 2014, 2015, and 2016 (see id. at 6). (Compare id. at 7-8, with Docket Entry 69-1 at 7-8.) The parties fail to acknowledge this impediment to their request. (See generally Docket Entries 69, 70.)

Accordingly, the Court will deny the Strike Motion, but without prejudice to the parties promptly filing a motion that appropriately addresses the foregoing concerns. If the parties decline to submit such motion, the Court will direct the Clerk to

remove the "temporar[y]" access restrictions on the relevant exhibits.

## CONCLUSION

Plaintiffs failed to establish their Article III standing to pursue this lawsuit. In addition, the parties have not presented grounds justifying their Strike Motion.

**IT IS THEREFORE ORDERED** that the Strike Motion (Docket Entry 69) is **DENIED** without prejudice to the filing, on or before September 4, 2018, of a motion that appropriately addresses the identified defects in the Strike Motion;

**IT IS FURTHER ORDERED** that the Clerk shall refer any such motion to the undersigned or, in the absence of such motion, the Clerk shall remove the access restrictions on the attachments to Docket Entry 53 (i.e., Docket Entries 53-1 through 53-5);

**IT IS RECOMMENDED** that the Court deny the Summary Judgment Motion (Docket Entry 44) and dismiss this action for want of subject-matter jurisdiction due to Plaintiffs' lack of standing.

This 24th day of August, 2018.

        /s/ L. Patrick Auld
        **L. Patrick Auld**
**United States Magistrate Judge**