IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AMY BRYANT, M.D., BEVERLY GRAY,       )
M.D., ELIZABETH DEANS, M.D.,          )
and PLANNED PARENTHOOD SOUTH          )
ATLANTIC,                             )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )     1:16CV1368
                                      )
JIM WOODALL, ROGER ECHOLS,            )
ELEANOR E. GREENE, and RICK           )
BRAJER,[1] each in their official     )
capacity,                             )
                                      )
            Defendants.               )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

This matter is before this court for review of the

Memorandum Opinion, Order, and Recommendation ("Recommendation")

filed on August 24, 2018, by the Magistrate Judge in accordance

with 28 U.S.C. § 636(b). (Doc. 71.) In the Recommendation, the

Magistrate Judge recommends that Plaintiffs' Second Motion for

Summary Judgment (Doc. 44) be denied and that this action be

---

[1] Effective January 13, 2017, Mandy K. Cohen, MD, MPH was
appointed as the Secretary of the North Carolina Department of
Health and Human Services. Secretary Cohen is the successor to
former Secretary Rick Brajer. Pursuant to Fed. R. Civ. P. 25(d),
Secretary Cohen is automatically substituted as a party
defendant for all claims asserted against Rick Brajer in his
official capacity as former Secretary of the North Carolina
Department of Health and Human Services.

dismissed for want of subject-matter jurisdiction due to Plaintiffs' lack of standing. The Recommendation was served on the parties to this action on August 24, 2018 (Doc. 72). Plaintiffs have filed objections, (Doc. 73), to the Recommendation. Pursuant to this court's order, (Doc. 74), Plaintiffs filed a Supplemental Memorandum in support of their objections to the Recommendation, (Doc. 75), Defendants responded, (Doc. 76), and Plaintiffs replied, (Doc. 82).

Following de novo review, this court agrees with the Recommendation as the record existed before the Magistrate Judge and, further, agrees with the Magistrate Judge that Plaintiffs failed to establish standing on that record. However, on the record and briefing submitted following issuance of the Recommendation, this court finds that Plaintiffs have established standing to challenge the twenty-week abortion ban set forth in N.C. Gen. Stat. § 14-45.1 and related statutes. This court further finds that Plaintiffs' second motion for summary judgment should be granted and that N.C. Gen. Stat. § 14-45.1(a) should be enjoined.

As noted above, this court agrees with the Magistrate Judge's Recommendation on the record before that court. It bears noting that, in the opinion of this court, Plaintiffs' counsel in this matter completely failed to heed the admonition of the Magistrate Judge as to concerns of standing and instead attempted

to proceed on a theory that Plaintiffs have standing as a matter of law. (See (Doc. 66) at 9 ("Put simply, the standing of abortion providers — like Plaintiffs — to challenge criminal statutes — like the ban — 'is not open to question.'").)[2] As this court made clear in its request for supplemental briefing, (see Suppl. Briefing Order (Doc. 74)), this court is not aware of any automatic right of standing to challenge an abortion regulation and "imaginary or speculative" fears of prosecution are insufficient to confer standing. Younger v. Harris, 401 U.S. 37, 42 (1971).

The Magistrate Judge quite clearly expressed a sound concern over the parties' failure to address standing — specifically, whether Plaintiffs could establish a credible threat of prosecution. As a result, that court requested further briefing on the issue. (See Doc. 65 at 3-5.) Rather than respond to the Magistrate Judge's request, Plaintiffs persisted in relying upon an argument that standing "is not open to question," (Doc. 66 at 9), and that "[d]ecades of black letter law establish that physicians, like Plaintiffs, who challenge criminal laws that prevent them from providing abortion care to patients have Article III standing." (Doc. 73 at 6-7.) Plaintiffs' arguments

---

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

were neither responsive nor persuasive to the issues identified by the Magistrate Judge.

It was only after this court requested supplemental briefing on the issues identified by the Magistrate Judge, (Suppl. Briefing Order (Doc. 74)), and offered to allow Plaintiffs to "submit the case based solely upon their current position," (id. at 7-8), that Plaintiffs fully addressed the issues critical to standing.

In light of the foregoing, it appears to this court that there has been unnecessary delay and judicial resources have been wasted to some degree because Plaintiffs' counsel have been unwilling or unable to address the issue of standing as necessary in this case. This court has considered whether the Recommendation should be adopted and the case dismissed in light of the failure of Plaintiffs to establish standing before the Magistrate Judge. "The party invoking federal jurisdiction bears the burden of establishing" the three elements of standing, Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), and Plaintiffs failed to do so before the Magistrate Judge. However,

> as part of its obligation to determine de novo any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate. By definition, de novo review entails consideration of an issue as if it had not been decided previously.

<u>United States v. George</u>, 971 F.2d 1113, 1118 (4th Cir. 1992) (footnote omitted). After further consideration, this court will evaluate the supplemental briefing and enter an opinion which ultimately amounts to a complete <u>de novo</u> review and analysis. Notwithstanding the new review and analysis, this court is concerned by the conduct of Plaintiffs' counsel of the briefing in this case. Plaintiffs request an award of "their reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988." (Complaint ("Compl.") (Doc. 1) ¶ 57). Counsel are hereby advised that, in light of the conduct summarized above, should Plaintiffs petition for attorney's fees, this court will carefully scrutinize any billing during the time between the Magistrate Judge's request for supplemental briefing and this court's request for supplemental briefing. Plaintiffs may face a heavy burden to receive an award for attorney's fees incurred during that time period.

I.  **FACTUAL BACKGROUND**

The relevant facts are recounted in detail in the Recommendation and this court will provide only a brief summary here.

North Carolina has banned abortion by statute for over one hundred years. <u>See</u> 1881 N.C. Sess. Laws 351. N.C. Gen. Stat.

§§ 14-44 and 14-45 criminalize abortion generally and remain on the statute books.[3] N.C. Gen. Stat. § 14-45.1(a) was amended in 1973 to provide that, notwithstanding this general ban, "it shall not be unlawful" to perform an abortion before the twenty-week point of a pregnancy. <u>See</u> 1973 N.C. Sess. Laws 711 (H.B. 615). This framework contains certain statutory exceptions, including an exception permitting abortion after twenty weeks in the case of "a medical emergency." <u>See</u> N.C. Gen. Stat. § 14-45.1(b). The parties have not identified any prosecutions for performing an abortion in violation of the criminal statutes during the forty-five-year history of the current statutory framework.[4]

The North Carolina legislature amended N.C. Gen. Stat. § 14-45.1, effective in 2016. <u>See</u> 2015 N.C. Sess. Laws 2015-62 (H.B. 465). The pre-amendment version of N.C. Gen. Stat. § 14-45.1 permitted an abortion after the twentieth week of pregnancy when there was "substantial risk that the continuance of the pregnancy would threaten the life or gravely impair the

---

[3] North Carolina historically prosecuted abortion doctors under these statutes. <u>See, e.g.</u>, <u>State v. Hoover</u>, 252 N.C. 133, 136, 113 S.E.2d 281, 284 (1960).

[4] The Magistrate Judge identified a single indictment for violating the twenty-week ban in 1987 and, as explained, this instance does not provide a credible threat of prosecution. (<u>See</u> Recommendation (Doc. 71) at 28 n.13.) The sole prosecution under the statute, which was later dismissed in a superseding indictment, was against a defendant charged with murdering a pregnant woman rather than against a doctor carrying out a medical procedure. (<u>Id.</u>)

health of the woman."[5] See id. The amended version of the statute

permits an abortion after the twentieth week of pregnancy "if

there existed a medical emergency as defined by G.S. 90-

21.81(5)." See id.; N.C. Gen. Stat. § 14-45.1(b). N.C. Gen. Stat.

§ 90-21.81(5) defines a "medical emergency" as:

> A condition which, in reasonable medical judgment, so
> complicates the medical condition of the pregnant woman
> as to necessitate the immediate abortion of her
> pregnancy to avert her death or for which a delay will
> create serious risk of substantial and irreversible
> physical impairment of a major bodily function, not
> including any psychological or emotional conditions.
> For purposes of this definition, no condition shall be
> deemed a medical emergency if based on a claim or
> diagnosis that the woman will engage in conduct which
> would result in her death or in substantial and
> irreversible physical impairment of a major bodily
> function.

## II.  PROCEDURAL HISTORY

Plaintiffs filed their complaint in this case on

November 30, 2016, (Compl. (Doc. 1)), and initially moved for

summary judgment on December 14, 2016, (Doc. 13). The Magistrate

Judge then granted Defendants' Rule 56(d) motion for limited

discovery to respond to Plaintiffs' allegations, (Doc. 31), and

this court affirmed that ruling, (Doc. 36). Plaintiffs again

moved for summary judgment, (Doc. 44), and Defendants opposed

---

[5] This language was enacted in 1967 as an exception to the
then-existing total abortion ban and thus pre-dates the twenty-
week ban. See 1967 N.C. Sess. Laws 367 (S.B. 104).

that motion. (Defs.' Resp. to Pls.' Second Mot. for Summ. J. ("Defs.' Resp. Br.") (Doc. 52).)

During discovery, Plaintiffs each responded to interrogatories and document requests from Defendants. (See Docs. 53-1 through 53-4.) Plaintiffs deposed Defendants' expert witnesses, Martin J. McCaffrey, M.D., (Deposition of Martin J. McCaffrey ("McCaffrey Dep.") (Doc. 53-5)), and John M. Thorp, Jr., M.D., (Deposition of John M. Thorp, Jr. ("Thorp Dep.") (Doc. 59-1).) In addition, certain amici curiae filed a brief opposing Plaintiffs' second motion for summary judgment.[6] (Doc. 50-1.)

## III. **STANDARD OF REVIEW ON MAGISTRATE JUDGE'S RECOMMENDATION**

This court is required to make "a de novo determination of those portions of the [Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the [M]agistrate [J]udge. . . . or recommit the matter to the [M]agistrate [J]udge with instructions." Id.

This court may, but is not required to, apply a clearly erroneous standard to any part of the Magistrate Judge's

---

[6] Specifically, the states of West Virginia, Alabama, Arkansas, Indiana, Louisiana, Michigan, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, and Texas assert that North Carolina's twenty-week abortion ban does not violate the United States Constitution under controlling Supreme Court precedent. (Doc. 50-1.)

recommendation not specifically objected to by the parties.
Diamond v. Colonial Life Accident Ins. Co., 416 F.3d 310, 315
(4th Cir. 2005); see also Fed. R. Civ. P. 72(b) advisory
committee's note to 1983 addition ("When no timely objection is
filed, the court need only satisfy itself that there is no clear
error on the face of the record in order to accept the
recommendation.") (emphasis added). "A finding is clearly
erroneous when although there is evidence to support it, the
reviewing court on the entire evidence is left with the definite
and firm conviction that a mistake has been committed." United
States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948) (internal
quotations omitted).

## IV.  **STANDING**

### A.  **Legal Framework**

The doctrine of standing "ensure[s] that federal courts do
not exceed their authority as it has been traditionally
understood." Spokeo, Inc. v. Robins, 578 U.S. ___, 136 S. Ct.
1540, 1547 (2016). Because standing is a jurisdictional
requirement, it can be raised at any time by any party or by the
court. See Plyler v. Moore, 129 F.3d 728, 731 n.6 (4th Cir.
1997). A plaintiff has Article III standing when he or she has
"(1) suffered an injury in fact, (2) that is fairly traceable to
the challenged conduct of the defendant, and (3) that is likely
to be redressed by a favorable judicial decision." Spokeo, 136 S.

- 9 -

Ct. at 1547 (internal citations omitted). Standing is an element within the "case-or-controversy" analysis, which limits the scope of federal jurisdiction to only those cases where a genuine dispute exists between the parties. See generally Beck v. McDonald, 848 F.3d 262, 269 (4th Cir.), cert. denied, ___ U.S. ____, 137 S. Ct. 2307 (2017).

Both parties agree that the relevant question in this case is whether a plaintiff has suffered an injury in fact based solely on the threat of a possible future prosecution under N.C. Gen. Stat. § 14-45.1 and related statutes. (See Pls.' Suppl. Mem. in Supp. of Obj. ("Pls.' Suppl. Mem.") (Doc. 75) at 6-7; Defs.' Resp. to Suppl. Briefing Order ("Defs.' Resp.") (Doc. 76) at 2-3.) The injury-in-fact analysis is governed by the test set forth in Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1989). Namely, Plaintiffs must "allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." Id. at 298.

Defendants do not appear to dispute that Plaintiffs have alleged the intent to engage in conduct "affected with a

constitutional interest."[7] It is also undisputed that providing

an abortion after the twenty-week point of a pregnancy is

currently unlawful in North Carolina. Therefore, the standing

result in this case turns solely on whether there is a "credible

threat of prosecution" under N.C. Gen. Stat. § 14-45.1 and

related statutes. This is a fact-specific inquiry that asks

whether a reasonable person would fear prosecution under the

statute given the historical circumstances and official

statements about possible future enforcement. See Babbitt, 442

U.S. at 302 ("Appellees are thus not without some reason in

fearing prosecution for violation of the ban on specified forms

of consumer publicity."); Laird v. Tatum, 408 U.S. 1, 14 (1972)

(stating that a plaintiff must show "specific present objective

harm or a threat of specific future harm" to have standing, and

noting that a subjective fear will not suffice); Thomas v.

Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1139 (9th Cir.

2000) ("In evaluating the genuineness of a claimed threat of

prosecution, we look to whether the plaintiffs have articulated a

concrete plan to violate the law in question, whether the

---

[7] Nor can they reasonably dispute such intent. It is well-established that the Fourteenth Amendment encompasses a right to abortion, defined and limited by Supreme Court precedent. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 846 (1992) ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment.").

prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute.").

### 1.    Historical Record of Prosecutions

The threat of prosecution under a statute must be objectively reasonable under the circumstances for plaintiffs to have standing. See Doe v. Duling, 782 F.2d 1202, 1206 (4th Cir. 1986). When no offenders have been prosecuted under the law for a lengthy period, this factor suggests that only a theoretical threat exists, that any fear is subjective and unreasonable, and that plaintiffs likely do not have standing to challenge the law. See Poe v. Ullman, 367 U.S. 497, 499–502 (1961) (holding that the plaintiffs lacked standing to challenge a Connecticut contraception ban where there were no prosecutions during the statute's eighty-two-year history and the statute was openly violated, despite the state's purported intention to prosecute violations); see also Duling, 782 F.2d at 1204, 1206-07 (finding that the threat of prosecution under a Virginia fornication ban was "only the most theoretical" where "the last recorded conviction for private, consensual cohabitation occurred" one hundred years prior, violations were common, and members of law enforcement expressed doubt that the statute in fact restricted private, consensual behavior).

Specifically, the mere existence of a criminal statute without more (historical prosecution, official threats of prosecution, recent legislative amendment, or prosecution under related statutes) is ordinarily not enough to establish a credible threat of prosecution. See Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006) ("The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue."); but see Epperson v. Arkansas, 393 U.S. 97, 109–10 (1968) (Black, J., concurring) (noting doubts about plaintiff's standing to challenge an Arkansas anti-evolution law that was not enforced for almost forty years, where the majority assumed standing and moved straight to the substantive constitutional analysis); Duling, 782 F.2d at 1206 (identifying Epperson as belonging to a class of cases where "the chilling effect of a statute is so powerful and the rights it inhibits so important that the mere existence of the statute may warrant judicial intervention").

On the other end of the spectrum, a law that the state consistently enforces is clearly subject to challenge. See, e.g., Mausolf v. Babbitt, 85 F.3d 1295, 1302 (8th Cir. 1996) (finding that the members of a snowmobiling club had standing to challenge regulations restricting trail use that were being actively enforced and prevented the members from viewing wildlife).

Relatedly, the case law suggests that a recently-enacted law is likely to create a credible threat of prosecution even if the state has yet to prosecute individuals for violating the statute. See, e.g., Doe v. Bolton, 410 U.S. 179, 188 (1973) (holding that plaintiffs had standing to challenge a Georgia abortion statute that was "recent and not moribund" and was the successor to a statute under which doctors were prosecuted); see also Mobil Oil Corp. v. Attorney Gen. of Va., 940 F.2d 73, 76 (4th Cir. 1991) (finding that plaintiffs had standing to challenge a recently-enacted statute when the state attorney general was silent regarding prospective enforcement; holding that "[w]e see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced").

For example, in American Booksellers Association v. Virginia, 802 F.2d 691 (4th Cir. 1986), vacated on other grounds, 488 U.S. 905 (1988) ("Booksellers I"), plaintiffs challenged an obscene material sales ban that had been recently amended to prohibit the display of such materials where children might be able to view them. Id. at 693. The Fourth Circuit held that the plaintiffs had standing and noted that "[i]t would be unreasonable to assume that the General Assembly adopted the 1985 amendment without intending that it be enforced." Id. at 694 n.4. In its initial review of the case, the Supreme Court agreed that the plaintiffs had standing and noted that "[t]he State has not

- 14 -

suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise." Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988) ("Booksellers II").

## 2.  Open and Notorious Violations

Where a long period of time has passed with no prosecutions under a criminal statute, the question of whether the statute is openly violated without consequence becomes relevant to the standing analysis. See Ullman, 367 U.S. at 502 (noting the fact that "contraceptives are commonly and notoriously sold in Connecticut drug stores" as a feature suggesting no credible threat of prosecution) (footnote omitted). A lack of prosecutions may simply indicate scrupulous compliance with the law. However, when individuals publicly engage in behavior that violates the law and suffer no legal consequence, this suggests that the state has acquiesced to such conduct and that no constitutional injury inures to those seeking to challenge the statute. See, e.g., Duling, 782 F.2d at 1204 (noting that "fornication and cohabitation are common forms of conduct in society generally and in the City of Richmond in particular") (internal quotation marks omitted); Winsness, 433 F.3d at 732 ("Mr. Larsen openly engaged in conduct he believes was in violation of the Utah flag-abuse statute, and suffered no consequences.").

### 3. __Government Statements regarding Prosecution__

There is almost certainly a credible threat when the government actively threatens to prosecute individuals under a specific statute. See, e.g., Steffel v. Thompson, 415 U.S. 452, 459 (1974) (finding that a plaintiff who had been warned to stop distributing leaflets and threatened with arrest if he did not cease had standing to challenge a criminal trespass law on First Amendment grounds). Because no one is ever required to engage in prohibited conduct and risk criminal sanction when the threat of prosecution is real, threats alone can confer standing. See, e.g., Babbitt, 442 U.S. at 298; see also Booksellers I, 802 F.2d at 694 ("[A] plaintiff does not have to expose himself to prosecution when a statute imposes a criminal penalty.").

Public statements disavowing an intent to prosecute offenders under the relevant statute weigh against standing by making the threat of prosecution less credible. See, e.g., Babbitt, 442 U.S. at 302 (looking to whether the "[s]tate has . . . disavowed any intention of invoking the criminal penalty provision" as a factor to determine whether plaintiffs had standing); Holder v. Humanitarian Law Project, 561 U.S. 1, 15–16 (2010) (finding that the plaintiffs had standing to bring a pre-enforcement constitutional challenge to a terrorism material-support statute, in part because the government had initiated prosecutions thereunder and failed to disavow the statute); see

also <u>Booksellers II</u>, 484 U.S. at 383; <u>Bronson v. Swenson</u>, 500 F.3d 1099, 1108 (10th Cir. 2007) (stating that "affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute [may] prevent[] a threat of prosecution from maturing into a credible one, even when the plaintiff previously has been arrested under the statute") (internal quotation marks omitted).

There is no requirement that the state's disavowal of prosecution carry the force of law or come in any specific form. Under the objective standard that governs the "credible threat" analysis, the disavowal must simply assure a reasonable person that there is no risk to them of engaging in protected conduct proscribed by the statute. When an official disavowal is issued, courts proceed to evaluate whether the facts and circumstances surrounding the disavowal make it sufficient to eliminate any reasonable fear of prosecution and negate standing. <u>Compare</u> <u>Va. Soc. for Human Life, Inc. v. Fed. Elec. Comm'n</u>, 263 F.3d 379, 388 (4th Cir. 2001) (finding that an unofficial policy statement did not negate the credible threat of prosecution because it did not have the force of law and was subject to change if members of the commission turned over), <u>with</u> <u>Mink v. Suthers</u>, 482 F.3d 1244, 1254–55 (10th Cir. 2007) (holding that a district attorney's "no file" letter disavowing the intent to prosecute plaintiff specifically removed the credible threat of prosecution, even

though it was not binding on successors and did not completely eliminate any possibility of future prosecution).

B.   **Analysis**

1.   **Historical Record of Prosecutions**

Most precedential cases deal with either (1) statutes that have not been enforced for many decades, see Ullman and Duling, or (2) recently-enacted laws for which standing is generally assumed, see Bolton. N.C. Gen. Stat. § 14-45.1(a) presents a relatively unique factual scenario: the portion of the statute that Plaintiffs challenge as unconstitutional under Casey, the twenty-week abortion ban, remains unchanged from the version originally enacted in 1973. That law is the successor statute to a North Carolina law under which abortion doctors were prosecuted. The state legislature recently amended other portions of the same statutory framework — specifically, the language of the medical emergency exception — but did not amend the twenty-week ban itself.

This case falls somewhere in the middle of the spectrum described above. The 2016 amendment does not erase the historical lack of prosecutions and completely reset the clock, nor does it make this case equivalent to one in which the state legislature had only recently passed an abortion ban. See, e.g., Isaacson v. Horne, 716 F.3d 1213, 1217–18, 1221 (9th Cir. 2013) (finding that plaintiffs, who brought suit in July 2012, had standing to

challenge Arizona's twenty-week abortion ban passed in April
2012). However, the amendment is at least a factor in evaluating
the objective reasonableness of Plaintiffs' professed fear of the
twenty-week ban and belief that the ban could be enforced at any
time. See Booksellers I, 802 F.2d at 693. This is true because
the ban and the medical emergency and other exceptions thereto
form part of a unitary scheme regulating abortion in North
Carolina. See, e.g., McCorvey v. Hill, 385 F.3d 846, 849 (5th
Cir. 2004) (explaining that Texas abortion laws constituted a
unified scheme and that old criminal statutes from the pre-Roe
era were repealed by implication as inconsistent with the current
regulatory framework).

Defendants state in their supplemental brief that they "do
not believe that, in common English language usage, the two
maternal health exceptions are meaningfully different or that one
is more or less strict and/or narrow than the other." (Defs.'
Resp. (Doc. 76) at 10.) It is well-established that changes to
statutory language are presumed to have substantive meaning. See
Stone v. INS, 514 U.S. 386, 397 (1995) ("When Congress acts to
amend a statute, we presume it intends its amendment to have real
and substantial effect."); cf. Walters v. Nat'l Ass'n of
Radiation Survivors, 473 U.S. 305, 317–18 (1985) (finding that a
minor change in a law between the time it was passed and the time
it was codified did not necessarily have substantive meaning).

Contrary to this doctrine, Defendants argue that the 2016 amendment in fact made no substantive change to the twenty-week ban's medical exception.

The 2016 amendment of N.C. Gen. Stat. § 14-45.1 was extensive. See 2015 N.C. Sess. Laws 2015-62 (H.B. 465). The amendment imposed substantial reporting obligations on abortion providers for any abortion performed after sixteen weeks, expanded the universe of medical facilities from which information is collected, restricted the type of doctor who may perform an abortion in the state, and lengthened the informed consent waiting period from twenty-four to seventy-two hours. See id.

The amendment also completely revamped the medical exception to the twenty-week ban. The pre-2016 exception permitted abortions when there was "substantial risk that continuance of the pregnancy would threaten the life or gravely impair the health of the woman." Id. The current statute permits abortions only due to "a condition which . . . necessitate[s] the immediate abortion of [the] pregnancy to avert [the mother's] death or for which a delay will create serious risk of substantial and irreversible physical impairment of a major bodily function, not including any psychological or emotional conditions." N.C. Gen. Stat. § 90-21.81(5) (emphasis added).

This court finds that the 2016 amendment substantively altered a woman's ability to obtain a post-viability abortion in North Carolina. Any other interpretation is inconsistent with the plain language of the amendment, because, as Plaintiffs observe, the new exception does not appear to cover degenerative diseases that may gravely impair the mother's health over a gradual period but never necessitate immediate abortion at any point to save the mother's life. (See Pls.' Supp. Mem. (Doc. 75) at 13.) Defendants' proffered interpretation also is not convincing when viewed in light of the numerous similar statutory alterations enacted by state legislatures nationwide in recent years. See, e.g., 2016 S.D. Sess. Laws Ch. 180 (S.B. 72) (amending the medical exception to apply only in the event of a "medical emergency," when the prior version of this statute permitted post-twenty-week abortions if "necessary to preserve the life or health of the mother"); 2014 Fla. Laws Ch. 2014-137 (C.S.H.B. No. 1047) (amending the medical exception to apply only when an abortion is necessary to "avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition" rather than simply to "preserve the health of the pregnant women").

This court concludes that the 2016 amendment altered the maternal health exception to the twenty-week ban by narrowing the universe of abortions that are permissible under this exception.

First, the amendment restricts the health exception to cover only those conditions that create a "serious risk of substantial and irreversible physical impairment of a major bodily function," rather than merely a "substantial risk . . . [to] the health of the woman." Second, the amendment narrows the threshold medical determination of what conditions qualify for the exception, because a physician must now determine that the condition "necessitates" an "immediate" abortion. This means that medical-exception abortions are no longer permissible for conditions that cause gradual health damage but never, at any specific point, reach the level of immediacy required under the statute. Third and finally, the amendment explicitly excludes "any psychological or emotional conditions" and threats of suicide or self-harm, which were presumptively within the pre-amendment medical exception if they created a substantial risk of gravely impairing the mother's health. See Stone, 514 U.S. at 397 (stating that an amendment to statutory language is presumed to have "real and substantial effect").

When one aspect of a statutory scheme is altered, this creates a reasonable presumption that other changes may follow or that the legislature's general intentions regarding the enforcement of the scheme is evolving. This is especially true here, because the abortions that are carved out by the amended medical emergency exception would still be legal but for the

continued presence of the twenty-week ban. In this court's view, it is not possible to sever the amendment's effect from the ban itself because these provisions work in tandem. Therefore, by narrowing the maternal health exception to the twenty-week ban, the 2016 amendment revived the threat of future prosecution under the ban.

This threat is slightly lower than would be present following a newly-enacted ban, but greater than the threat that would exist under a static statute where there had been no prosecutions for over forty years. This court will now proceed to determine whether either the openness of any alleged violations of N.C. Gen. Stat. § 14-45.1 and related statutes or Defendants' official disavowals mitigate this threat such that Plaintiffs nevertheless lack standing to challenge the ban.

### 2. Open and Notorious Violations

Plaintiffs' discovery responses suggest that Plaintiffs are complying with the ban by not providing abortions to patients past the twentieth week of pregnancy. (See, e.g., Beverly Gray Discovery Resps. (Doc. 53-2) at 4-5 (stating that Plaintiff Gray's practice turned away approximately ten to fifteen women seeking an abortion after the twentieth week of their pregnancy from 2014 to 2016.); Elizabeth Deans Discovery Resps. (Doc. 53-3) at 8-10) (stating that Plaintiff Deans "does not recall performing any abortion procedure in North Carolina after the

gestational limit set forth in N.C. Gen. Stat. § 14-45.1,"
despite her practice receiving requests to perform such
abortions).) There appears to be some dispute, however, regarding
whether past abortions provided by Plaintiffs after the twenty-
week point fell within the pre-amendment medical emergency
exception. (See Amy Bryant Discovery Resps. (Doc. 53-1) at 5
(describing a total of ten post-twenty-week abortions from 2014
to 2016 that Plaintiff Bryant asserts fell within the medical
exception to the ban); (see also Beverly Gray Disc. Resps. (Doc.
53-2) at 6 (stating that Plaintiff Gray performed a single
abortion procedure after twenty weeks between 2014 and 2016,
which fell within the exception).)

   This court agrees with the Magistrate Judge's analysis that
Plaintiffs have not conclusively demonstrated that any post-
twenty-week abortions were in fact performed pursuant to the
statutory exception as it existed at the relevant time. (See
Recommendation (Doc. 71) at 10-11.) On the other hand, this court
recognizes that information or records that might prove the
actual medical diagnosis in each such case are likely both not in
Plaintiffs' direct possession, (Elizabeth Deans Disc. Resps.
(Doc. 53-3) at 6 (stating that abortion records belong to the
medical center and may not be divulged for any purposes other
than client treatment)), and subject to medical privacy laws that
would prevent their disclosure into evidence. See, e.g., 42

U.S.C. § 1320d–6(a)(3) (describing penalties for "disclos[ing] individually identifiable health information to another person"); 10A N.C. Admin. Code 13B.3903 (restricting access to medical records and stating that records are the exclusive "property of the hospital").

In any event, Defendants have provided nothing to dispute Plaintiffs' contention that their North Carolina abortion practices have turned away women seeking abortions after the twentieth week of pregnancy. First, even if this court is to assume for argument that Plaintiffs have not scrupulously adhered to the terms of the medical exception (which this court is not able to determine without further evidence), there is nothing in the record to suggest that these were open or notorious violations. This court does not believe that a mis-interpretation of the medical exception constitutes an open or public violation of anything — it certainly does not equate, for example, to an abortion clinic openly advertising to the public that it will provide post-twenty-week abortions. To be relevant to the standing analysis, violations must be open and public; specifically, they must be known to law enforcement or state authorities or easily uncovered. See Ullman, 367 U.S. at 502 (stating that "ubiquitous, open, public sales would mere quickly invite the attention of enforcement officials" and finding that this fact weighed against standing); S.F. Cty. Democratic Cent.

Comm. v. Eu, 826 F.2d 814, 822 (9th Cir. 1987) (finding no open violations where "plaintiffs' uncontroverted affidavits show that they have consistently, if reluctantly, obeyed the statutes in conducting party affairs"). Violations must be public because surreptitious, well-concealed violations of a statute suggest little about the state's desire to prosecute offenders and because an individual's right to engage in constitutionally-protected conduct is not contingent upon avoiding public discovery.

According to affidavits submitted by Defendants, information about the medical determination of whether a certain patient meets the emergency exception to the twenty-week ban is confidential and is "not disclosed publicly . . . [and] never provided to law enforcement officials." (Affidavit of Eleanor Howell, M.S. ("Howell Aff.") (Doc. 80) ¶ 4.) Any violations here, occurring as they would in the private doctor-patient setting, simply do not come close to the public, open contraceptive sales that the Supreme Court emphasized in Ullman. This court finds, based on the record in this case, no open and notorious violations of the twenty-week ban.

### 3. Government Statements regarding Prosecution

Defendants have submitted to this court a set of e-mail messages and affidavits in which they profess certain intentions regarding the enforcement of N.C. Gen. Stat. § 14-45.1 and

related statutes criminalizing certain abortions. (<u>See</u> Docs. 80 and 81.) Defendants urge this court to find that these documents negate standing as a matter of law because they represent an official statement that violations of § 14-45.1 and related statutes will not be prosecuted. In other words, Defendants appear to argue that the legal authority of the e-mails are of no consequence; rather, the mere fact that Defendants have provided these e-mails should, by itself, settle the issue of standing. (Defs.' Resp. (Doc. 76) at 8.)

This court cannot accept Defendant's contention that the inquiry begins and ends with the existence of official statements disavowing prosecution. Indeed, this cannot be true because the Fourth Circuit and other circuit courts have evaluated in detail the legal force of prosecutorial disavowals in the standing context. <u>See, e.g.</u>, <u>EQT Prod. Comp. v. Wender</u>, 870 F.3d 322, 331 (4th Cir. 2017) (finding that the plaintiffs had standing to challenge a county ordinance that, by its plain language, precluded them from storing wastewater, despite the county's official position that the ordinance did not apply to plaintiffs' activities; stating that "the County's litigation position cannot override the plain text of the Ordinance when it comes to establishing a credible threat of enforcement"); <u>Va. Soc. for Human Life</u>, 263 F.3d at 387–89 (finding that an official policy statement to the effect that a law would not be enforced, while

more formal than a nonbinding promise, was not sufficient to negate the credible threat of prosecution because it did not carry the force of law and was subject to change if the agency's membership changed), <u>overruled on other grounds by</u> <u>The Real Truth About Abortion, Inc. v. Fed. Elec. Comm'n</u>, 681 F.3d 544 (4th Cir. 2012); <u>see also</u> <u>Chamber of Commerce v. Fed. Elec. Comm'n</u>, 69 F.3d 600, 603 (D.C. Cir. 1995) (where the FEC split 3-3 on whether to issue an advisory opinion stating that certain contemplated conduct was barred by newly-adopted regulatory language, this failure to opine did not negate the credible threat of prosecution even though a majority vote of the commission would be needed to initiate any prosecution; noting that only one commissioner would need to change his mind in order to enforce the rule).

Because the credible threat inquiry is a balancing test, <u>see</u> <u>Thomas</u>, 220 F.3d at 1139, no one factor is dispositive and each factor — the past record of prosecutions and statutory history, the presence of open violations, and any disavowal of future prosecution — should be weighed to determine its proper impact on the result. An unequivocal government disavowal backed by the full force of law and binding upon successors will weigh heavily against standing because such a statement can reasonably be relied upon. On the contrary, an isolated statement or message subject to the changing whims of individual government officials

and without force to bind successors does little to address the fear that one might be prosecuted under the statute tomorrow, were those officials to change course. See Va. Soc. for Human Life, 263 F.3d at 380 ("The Commissioners who adopted the policy might be replaced with ones who disagree with it, or some of the Commissioners who voted might change their minds. A simple vote of the Commission, in other words, could scuttle the policy."). Here, the e-mail messages submitted by Defendants suffer from a fundamental flaw separate and apart from the question of their legal force. Two of the three statements do not describe the government's future intentions regarding N.C. Gen. Stat. § 14-45.1 and related statutes; rather, they speak only in present terms. (See Affidavit of Isham Faison Hicks ("Hicks Aff.") (Doc. 81) at 4 (e-mail from Defendant Jim Woodall stating that he has "no present intentions to initiate criminal prosecutions arising out of the alleged violation of the 20-week abortion rule") (emphasis added)); (see also Howell Aff. (Doc. 80) ¶ 4(describing the DHHS policy to treat all patient information as confidential, stating that "DHHS has no present intention of deviating from this practice") (emphasis added).)

Where, as here, the government has not prosecuted anyone under the ban for over forty years, the only risk to Plaintiffs (that could create a credible threat of prosecution) is the possibility that Defendants may choose to initiate prosecutions

<u>in the future</u>. Any disavowal is relevant only to the extent that it describes the government's future intentions. Plaintiffs are undoubtedly aware that North Carolinians are not currently being prosecuted under N.C. Gen Stat. § 14-45.1 and related statutes, and do not need government assurance in this regard. They do, however, need government assurance about future prosecution in light of the 2016 amendment. Defendant Woodall's e-mail and Director Howell's affidavit each fail to provide this assurance.

Having concluded that Defendant Woodall's e-mail and Director Howell's affidavit contain no information regarding the possible future enforcement of N.C. Gen. Stat. § 14-45.1(a) and related statutes, this court is left with the e-mail message from Defendant Roger Echols in which Echols states that he "won't initiate any criminal prosecutions arising out of the alleged violation of the 20-week abortion rule set out in NCGS 14-45 and 45.1 in Durham County." (Hicks Aff. (Doc. 81) at 3.) There is no indication that this promise in any way binds Defendant Echols' successor as Durham County District Attorney, who took office in January 2019.[8]

This court notes three cases from the Tenth Circuit finding that an official disavowal negates the credible threat of

---

[8] <u>See</u> Virginia Bridges, <u>Deberry defeats incumbent to win race for Durham County district attorney</u>, The Herald-Sun, May 8, 2018, <u>available at</u> <u>https://www.heraldsun.com/news/politics-government/elections/article210725259.html</u>.

enforcement even when it does not entirely eliminate the
possibility of prosecution, and that a district attorney's
unilateral decision not to prosecute offenders, even if not
binding on successors or those outside the district,[9] is a
substantial factor that weighs against standing. See Bronson, 500
F.3d at 1108-09; Winsness, 433 F.3d at 732-33; D.L.S. v. Utah,
374 F.3d 971, 975 (10th Cir. 2004). However, this approach
appears to be unique to the Tenth Circuit. The credible threat
inquiry is normally dependent upon several factors and a
government assurance alone (no matter its binding force) does not
automatically deprive plaintiffs of standing to challenge a law.
Additionally, each of the Tenth Circuit cases is distinguishable
from the facts here. D.L.S. dealt with a challenge to Utah's
sodomy ban, which the Supreme Court's ruling in Lawrence v.
Texas, 539 U.S. 558 (2003), implicitly invalidated. D.L.S., 374
F.3d at 975. The Lawrence holding provided an additional
guarantee to the D.L.S. plaintiff that the Utah statute would not
be enforced and that he could rely on the prosecutor's
disavowals. Id. The other two cases, Winsness and Bronson, are

---

[9] In this particular case, whether an official disavowal
binds prosecutors outside of the prosecutorial districts in
which Plaintiffs operate is not relevant to Plaintiffs' own
objective fears, as Defendants appear to have exclusive control
over prosecutorial decisions within these two districts. (See
Compl. (Doc. 1) ¶¶ 12-13.) Therefore, in this court's view, the
geographic scope of Defendants' disavowals in no way undermines
their effectiveness.

different from the instant case because each challenged statute had existed for decades with no major amendments (approximately fifty and one hundred years, respectively) at the time of the lawsuit, and because each case involved an open, flagrant violation of the relevant statute. See Bronson, 500 F.3d at 1102–03 (stating that Utah's polygamy ban was passed in 1895 and that the plaintiffs had openly applied for a state marriage license in violation of the ban); Winsness, 433 F.3d at 732 (stating that the plaintiff engaged in public conduct, defacing a flag, that violated Utah Code § 76-9-601, a statute that had been in effect since at least 1953).

This court will finally note that it considers Defendants' strident defense of this case, as well as the wave of similarly-worded statutes passed by other state legislatures in recent years,[10] to constitute evidence that Defendants have not entirely disavowed future prosecutions under the twenty-week ban. Defendants cannot on one hand disavow prosecution, but on the other hand, defend the law as a constitutional exercise of state

---

[10] See, e.g., Ark. Code § 20-16-1405(a)(1) (twenty-week ban enacted in 2013); Iowa Code § 146B.2(2)(a) (twenty-week ban enacted in 2017); Wis. Stat. § 253.107(3) (twenty-week ban enacted in 2016). Actual prosecutions under such bans are rare. Cf. Patel v. State, 60 N.E.3d 1041, 1056–60 (Ind. Ct. App. 2016) (determining that a feticide statute was not intended to cover abortions performed in violation of Indiana's twenty-week ban; while the court suggested the defendant could have been charged with violating the ban, prosecutors instead charged homicide of a born-alive fetus).

authority. To this court, the most reasonable inference from such conduct is that Defendants hope to ensure the ban remains on the statute books to deter doctors from providing any post-twenty-week abortions while not actively investigating or initiating any criminal prosecutions under the ban. But if Plaintiffs are reasonably deterred from providing these abortions by the mere presence of the ban, they have suffered a potential constitutional injury.[11]

This deterrent impact is similar to the First Amendment's chilling effect doctrine: where a law reasonably dissuades individuals from engaging in constitutionally-protected speech for fear of criminal punishment, this chilling effect itself may form the basis for legal challenge. See, e.g., Younger, 401 U.S. at 50-51 (describing the chilling effect doctrine and stating that the effect of an overbroad statute on constitutional rights must be major and not outweighed by a legitimate state interest in "enforcing these laws against socially harmful conduct"); Walker v. City of Birmingham, 388 U.S. 307, 345 (1967) (emphasizing the "overriding duty to insulate all individuals

---

[11] This would be an entirely different case if there was any evidence that Plaintiffs had openly provided or advertised post-twenty-week abortions in violation of the statute. But, as previously discussed, the only potential statutory violations here arise solely from interpretation of the medical emergency exception in a private medical setting, not from any open, flagrant violations of the ban itself.

from the chilling effect upon exercise of First Amendment freedoms generated by vagueness, overbreadth and unbridled discretion"). In the same way, a statute that reasonably deters individuals from a constitutionally-protected sphere of individual freedoms, including the right to choose to have an abortion prior to viability, is susceptible to challenge due to such deterrence.[12]

While there may be certain statutes that have fallen into such disuse that no reasonable person would be deterred by their mere presence on the books, N.C. Gen. Stat. § 14-45.1(a) is not among them. In light of the 2016 amendment and their vigorous defense of the ban on constitutional grounds, Defendants' disavowals provide little assurance to providers who would offer abortions after the twenty-week point of a pregnancy but for the ban.

### 4. Conclusion

The Article III standing limitations are a vital restraint on the federal judicial power. See Duling, 782 F.2d at 1205 ("The case or controversy requirement maintains proper separation of

---

[12] While this court does not necessarily dispute Defendants' contention that the state has a legitimate public health interest in banning post-twenty-week abortions, (see Defs.' Resp. Br. (Doc. 52) at 10), this interest does not outweigh the ban's encroachment in a constitutionally-protected sphere given the Supreme Court's clear pronouncements on the pre-viability right to choose to have an abortion. See, e.g., Roe v. Wade, 410 U.S. 113, 163-64 (1973).

powers between courts and legislatures, provides courts with arguments sharpened by the adversarial process, and narrows the scope of judicial scrutiny to specific facts."). The standing requirements do not, however, sanction objectively-present constitutional injury. Further, this court finds that it "should not lightly determine that a statute has fallen into desuetude." S.F. Cty., 826 F.2d at 822 n.15. A state may suddenly decide to resume prosecutions under a seemingly languid and inert law, and laws that potentially restrict protected conduct may be used in novel or unexpected ways by private citizens. See, e.g., Griswold v. Connecticut, 381 U.S. 479, 480 (1965) (stating that Connecticut prosecuted and fined two doctors for selling contraceptives in violation of Conn. Gen. Stat. §§ 53-32 and 54-196, the very same statutory provisions under which the Supreme Court four years earlier in Ullman found no credible threat of prosecution); Martin v. Ziherl, 269 Va. 35, 38-39, 607 S.E.2d 367, 368 (Va. 2005) (striking down Va. Code § 18.2-344, the fornication ban at issue in Duling, as unconstitutional under Lawrence v. Texas, when the law was used to support a tort action alleging intentional infection with a sexually-transmitted disease).

     With these principles in mind, this court ultimately finds that the recent amendment to N.C. Gen. Stat. § 14-45.1, when viewed together with Plaintiffs' apparent compliance and

Defendants' failure to fully disavow future enforcement of the ban, illustrate that the threat of prosecution under this statute is credible. Therefore, this court finds that Plaintiffs have standing to challenge N.C. Gen. Stat. § 14-45.1(a).

## V.   SUMMARY JUDGMENT

### A.   Standard of Review

In reviewing a motion for summary judgment, this court must determine whether there remains a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). If there is no genuine dispute about any fact material to the moving party's claim, then "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968) (stating that a dispute is not genuine for summary judgment purposes when one party rests solely on allegations in the pleadings and does not produce any evidence to refute alternative arguments). This court must look to substantive law to determine which facts are material — only those "facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 247.

However, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; rather, the court must examine the alleged disputed facts to determine whether (1) the disputes are genuine and (2) the facts are material to the outcome. <u>Id.</u> at 247-48. "[T]he non-moving party must do more than present a 'scintilla' of evidence in its favor." <u>Sylvia Dev. Corp. v. Calvert Cty, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995). Ultimately, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249.

### B.  <u>Legal Framework</u>

Defendants and their amici mis-interpret Supreme Court precedent, which this court is bound to follow, as it relates to pre-viability abortions. The Supreme Court has indeed held that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833, 846 (1992) (plurality opinion). The Supreme Court has also clearly declared that, "[b]efore viability, the State's interests are not strong enough

to support a prohibition of abortion." Id.; see also Gonzales v. Carhart, 550 U.S. 124, 146 (2007) (explaining the Casey holding and reaffirming that states may not prevent a woman from terminating her pregnancy prior to viability). In other words, "[e]ven in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage [the mother]" to choose to continue her pregnancy if those regulations do not impose an undue burden; however, a state may not ban abortions at any point prior to viability. Casey, 505 U.S. at 872–74. These directives are neither complex nor contradictory: a state is never allowed to prohibit any swath of pre-viability abortions outright, no matter how strenuously it may believe that such a ban is in the best interests of its citizens or how minimal it may find the burden to women seeking an abortion.

The Supreme Court has recognized that, while viability is the point at which the state's legitimate interest rises to a level that may support an outright ban (with appropriate health exceptions), viability does not occur at a fixed number of weeks after the pregnancy begins but rather is determined individually in each case by a doctor. See Roe, 410 U.S. at 160 ("Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks.") (footnote omitted); Casey, 505 U.S. at 860 (affirming Roe's focus on viability but noting that the average point of viability had advanced significantly even in the

twenty years since <u>Roe</u> was decided). Indeed, the Supreme Court
has further stressed that "it is not the proper function of the
legislature or the courts to place viability, which essentially
is a medical concept, at a specific point in the gestation
period." <u>Planned Parenthood of Cent. Mo. v. Danforth</u>, 428 U.S.
52, 64 (1976); <u>see also</u> <u>Colautti v. Franklin</u>, 439 U.S. 379, 388-
89 (1979) ("Because this point may differ with each pregnancy,
neither the legislature nor the courts may proclaim one of the
elements entering into the ascertainment of viability — be it
weeks of gestation or fetal weight or any other single factor —
as the determinant of when the State has a compelling
interest.").

Because viability is the relevant guidepost under Supreme
Court precedent, many states have chosen to proscribe abortion
after viability rather than enacting a week-specific ban.[13] <u>See,
e.g.</u>, Mo. Stat. § 188.030(1) ("Except in the case of a medical
emergency, no abortion of a viable unborn child shall be

---

[13] Other states have implemented a week-specific ban that is
longer than twenty weeks. <u>See, e.g.</u>, W. Va. Code § 16-2M-4(a)
(prohibiting abortion once "the fetus has reached the pain
capable gestational age," which is defined as twenty-two weeks
after the last menstrual period); Mass. Gen. Laws § 12M (twenty-
four-week ban); <u>but see</u> <u>Danforth</u>, 428 U.S. at 64 ("[I]t is not
the proper function of the legislature or the courts to place
viability, which essentially is a medical concept, at a specific
point in the gestation period."). Yet another approach is to
impose a week-specific ban but permit abortions of non-viable
fetuses no matter the gestational age. <u>See, e.g.</u>, Kan. Stat.
§ 65-6703(c).

performed or induced."); Del. Code § 1790(b) (stating that "[a] physician may not terminate . . . a human pregnancy otherwise than by birth after viability" unless pursuant to a statutory medical exception). It is not within this court's mandate to opine on the wisdom of using viability as the pivotal point.[14] The Supreme Court has made that decision. This court's sole job is to apply the viability framework to the facts of this case.

**C.   Analysis**

The only fact material to Plaintiffs' claim is whether N.C. Gen. Stat. § 14-45.1(a) and related statutes prohibit any pre-viability abortions. Defendants, however, offer three issues that they contend are disputed material facts in this case. (See Defs.' Resp. Br. (Doc. 52) at 6-7.) First, Defendants urge that

---

[14] Justice White articulated the main concern about using viability as the cutoff while dissenting from the Supreme Court's holding in Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747 (1986), overruled by Casey, 505 U.S. 833 (1992). Specifically, Justice White observed that:

> The substantiality of [the state's interest in protecting fetal life] is in no way dependent on the probability that the fetus may be capable of surviving outside the womb at any given point in its development, as the possibility of fetal survival is contingent on the state of medical practice and technology, factors that are in essence morally and constitutionally irrelevant. The State's interest is in the fetus as an entity in itself, and the character of this entity does not change at the point of viability under conventional medical wisdom.

Id. at 795 (White, J., dissenting).

the point of viability is a fact in genuine dispute. However, as discussed above, the Supreme Court has held that the particular point at which viability occurs is legally irrelevant and will necessarily vary under the specific circumstances of each pregnancy. Casey, 505 U.S. at 870. Defendants state in their opposition brief that "evidence developed during expedited discovery tends to show that viability is possible by 22 weeks lmp." (Defs.' Resp. Br. (Doc. 52) at 9.) This court infers from Defendants' statement that they concede viability is generally not possible between twenty and twenty-two weeks after a woman's last menstrual period ("LMP"),[15] which means that the ban clearly

_____

[15] Although N.C. Gen. Stat. § 14-45.1 and related statutes do not specifically define the starting point from which a pregnancy is to be measured, Defendants' expert Dr. Martin J. McCaffrey states that the legal prohibition is intended to cover abortions occurring after twenty weeks LMP. (See McCaffrey Dep. (Doc. 53-5) at 19); see also Comprehensive Health of Planned Parenthood, Inc. v. Templeton, 954 F. Supp. 2d 1205, 1213 n.4 (D. Kan. 2013) ("The exact date of fertilization is rarely known; it typically occurs 14 days after the first day of the LMP, which means that a gestational age referred to in terms of fertilization is typically two weeks earlier than one measured by the LMP.").

encompasses at least some pre-viability abortions.[16] Even if it did not, however, the week-specific point of viability cannot be relevant to this dispute because the Supreme Court has clearly advised that a state legislature may _never_ fix viability at a specific week but must instead leave this determination to doctors. Danforth, 428 U.S. at 64. Any dispute as to the specific point of viability is not material to Plaintiffs' claim and cannot preclude summary judgment.[17]

---

[16] Defendants' expert medical witness also concedes that a fetus is almost never viable prior to twenty-two weeks LMP. (McCaffrey Dep. (Doc. 53-5) at 121, 124–25.) As the Supreme Court has instructed, the legal definition of viability is time at which the fetus "has the capability of meaningful life outside the mother's womb." Roe, 410 U.S. at 163; see also Casey, 505 U.S. at 870. This definition could be read to require a chance of independent survival, without medical intervention, in which case the ban covers an even larger number of non-viable fetuses. (See McCaffrey Dep. (Doc. 53-5) at 118 (describing medical interventions normally needed for twenty-two-week fetuses to survive).)

[17] This court further notes Defendants' assertion that the unreliability of gestational age estimates may create a genuine factual issue. (Defs.' Resp. Br. (Doc. 52) at 10; see also Thorp Dep. (Doc. 59-1) at 4.) However, this court does not understand Defendants to argue that such estimates are so imprecise as to raise an issue of whether the viability of all fetuses might in fact occur at or prior to twenty weeks LMP. Because Casey and other Supreme Court cases teach that viability is the critical point and that viability cannot be fixed and is a case-by-case medical determination subject to change due to technological advances, the reliability of gestational age estimates (like the point of viability itself) is not a factor in the judicial determination of whether a state statute complies with the Casey framework.

Second, Defendants argue that a material dispute exists as to whether the state's interest in protecting maternal health — specifically, the state's interest in preventing complications from abortion and protecting against the risk of future medical conditions and possible future premature births — is sufficiently compelling to support the ban. (Defs.' Resp. Br. (Doc. 52) at 6; see also McCaffrey Dep. (Doc. 53-5) at 188 ("[P]rior surgical abortion certainly is associated with a future preterm birth.").) But Casey is quite clear on this point: no matter what the state's legitimate interest in restricting abortion, this interest can never support an outright ban prior to viability. Casey, 505 U.S. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."). While not titled as such, N.C. Gen. Stat. § 14-45.1(a) is a ban and not a regulation. In conjunction with §§ 14-44 and 14-45, North Carolina law criminalizes all non-emergency abortions performed after twenty weeks, without regard to the type of procedure or how the abortion is obtained. Because N.C. Gen. Stat. § 14-45.1(a) and related statutes operate as a total ban after twenty weeks, any dispute as to the nature or force of the state's interest in addressing maternal health risks from abortion is immaterial as

it relates to the statute's prohibition of pre-viability abortions.

Finally, Defendants urge that there is a genuine dispute regarding the actual burden that the statute places on women seeking abortions, primarily because Defendants question whether Plaintiffs have shown that any (or, in the alternative, a substantial number of) women seek post-twenty-week abortions in North Carolina. (Defs.' Resp. Br. (Doc. 52) at 11.) However, Defendants improperly invoke the undue burden standard which, under Casey and its progeny, applies only to a pre-viability regulation. See, e.g., Gonzales, 550 U.S. at (stating that the undue burden standard applies to pre-viability state regulations, evaluating and striking down a state law prohibiting only a specific type of abortion procedure under this standard). As described above, the North Carolina statutes operate as a total ban, not a regulation, after twenty weeks. See Isaacson, 716 F.3d at 1226 (holding that a similar twenty-week provision was a ban, not a regulation, because it "does not just restrict a woman's right to choose a particular method of terminating her pregnancy before viability; it eliminates a woman's right to choose abortion itself") (internal quotation marks omitted). Casey's clear dictate applies in this case: state law cannot impose an outright ban that prevents a "woman [from] choos[ing] to have an abortion before viability . . . ." Casey, 505 U.S. at 846.

**D.   Conclusion**

There is no genuine dispute as to any material fact necessary to Plaintiffs' constitutional claim. Plaintiffs' motion for summary judgment will be granted and the enforcement of N.C. Gen. Stat. § 14-45.1(a) will be enjoined. Finally, this court notes briefly that its ruling accords universally[18] with those of other federal courts that have considered the constitutionality of twenty-week bans and similar week- or event-specific abortion bans. See, e.g., McCormack v. Herzog, 788 F.3d 1017, 1029 (9th Cir. 2015) (striking down Idaho's twenty-week ban; stating that, "[b]ecause § 18-505 places an arbitrary time limit on when women can obtain abortions, the statute is unconstitutional"); Isaacson, 716 F.3d at 1228-29 (striking down Arizona's twenty-week ban, finding that the statute violated "the Supreme Court's clear rule that no woman may be entirely precluded from choosing to terminate her pregnancy at any time prior to viability"); Jane

---

[18] The only circuits to have considered the constitutionality of similar statutes are the Eighth, Ninth, and Tenth Circuits. The states, other than North Carolina, that currently have a twenty-week or twenty-two-week abortion ban in place are: Alabama, Arkansas, Georgia, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, West Virginia, and Wisconsin (these laws vary in terms of using fertilization or LMP as the starting point of a pregnancy). As no such bans exist in any states within the First, Second, or Third Circuits, the cases cited represent perhaps a more unified consensus than their geographic concentration might suggest.

L. v. Bangerter[19], 102 F.3d 1112, 1116–18 (10th Cir. 1996)

(striking down Utah's twenty-week abortion ban under the "undue

burden" standard); see also MKB Mgmt. Corp. v. Stenehjem, 795

F.3d 768, 773–76 (8th Cir. 2015) (striking down North Dakota's

fetal heartbeat law, which banned abortion at the moment a

heartbeat was detected; noting problems with the continued use of

the viability standard); Edwards v. Beck, 786 F.3d 1113, 1117

(8th Cir. 2015) (per curiam) (striking down Arkansas' fetal

heartbeat law); Jackson Women's Health Org. v. Currier, 349 F.

Supp. 3d 536, 538, 545 (S.D. Miss. 2018) (enjoining a Mississippi

law that banned abortions after fifteen weeks; Mississippi still

bans abortion at twenty weeks LMP under Miss. Code § 41-41-137),

appeal docketed sub nom, Jackson Women's Health Org. v. Thomas

Dobbs, No. 18-60868 (5th Cir. Dec. 17, 2018).

---

[19] The Bangerter court analyzed Utah's twenty-week ban under
the "undue burden" standard. While this approach does not change
the result, because a ban by its very nature unduly burdens the
abortion decision, this court considers that approach incorrect
because Casey states that the undue burden standard applies only
to regulations that "ensure [the] choice is thoughtful and
informed" and not to laws that take away entirely the mother's
"right to choose to terminate or continue her pregnancy before
viability." Casey, 505 U.S. at 872. As to outright bans, Casey
is clear that it does not abrogate Roe's central holding: a
state may not ban abortion prior to viability. Id. at 860
(affirming "Roe's central holding, that viability marks the
earliest point at which the State's interest in fetal life is
constitutionally adequate to justify a legislative ban on
nontherapeutic abortions").

## VI.  **CONCLUSION**

For the foregoing reasons, this court finds that Plaintiffs have standing to challenge the twenty-week abortion ban set forth in N.C. Gen. Stat. § 14-45.1(a) and related statutes. This court further finds that Plaintiffs' second motion for summary judgment should be granted and that N.C. Gen. Stat. § 14-45.1(a) should be enjoined.

In addition to § 14-45.1(a), Plaintiffs further request that this court find unconstitutional and enjoin the enforcement of N.C. Gen. Stat. §§ 14-44, 14-45, and 14-45.1(b). (See Doc. 44 at 2; Compl. (Doc. 1) ¶ 55.) While recognizing that the deletion of N.C. Gen. Stat § 14-45.1(a) would effectively criminalize all non-medical-emergency abortions in North Carolina, see N.C. Gen. Stat. § 14-44, this court further notes that Plaintiffs' requested relief would have the effect of legalizing abortion up to the point of birth. However, the North Carolina legislature, in passing these statutes, has expressed a clear intent to limit abortion as may be permitted by law. This court declines to act in a manner that would deprive the North Carolina legislature the opportunity, in the first instance, to either pass legislation or challenge this decision on appeal, whichever they decide may be in the interests of the citizens they represent. This court will, therefore, order the enforcement of N.C. Gen. Stat. § 14-45.1(a) enjoined, only to the extent that the statute prohibits any pre-

viability abortions. This court will further stay its order for a period of sixty days from the date hereof to permit full consideration of legislative alternatives or an appeal of this judgment.

**IT IS THEREFORE ORDERED** that the Memorandum Opinion, Order, and Recommendation, (Doc. 71), is **NOT ADOPTED** for the reasons stated herein.

**IT IS FURTHER ORDERED** that Plaintiffs' Second Motion for Summary Judgment, (Doc. 44), is **GRANTED.**

**IT IS FURTHER ORDERED** that N.C. Gen. Stat. § 14-45.1(a) is hereby declared unconstitutional and the enforcement of N.C. Gen. Stat. § 14-45.1(a) is **ENJOINED** only to the extent that N.C. Gen. Stat. § 14-45.1(a) prohibits any pre-viability abortions.

**IT IS FURTHER ORDERED** that the above order enjoining enforcement of N.C. Gen. Stat. § 14-45.1(a) is **STAYED** for a period of sixty (60) days from the date hereof.

A judgment for Plaintiffs shall be entered upon the expiration of the stay described above.

This the 25th day of March, 2019.

_William L. Osteen, Jr._
United States District Judge